**UNITED STATES** of America

v.

Wilson M. SMITH, Jr., and Raymond
Bowden, Defendants.

Crim. No. 324–62.

United States District Court
District of Columbia.

Oct. 23, 1962.

554

Charles T. Duncan, Principal Asst. U. S. Atty., for plaintiff.

Kenneth D. Wood, Washington, D. C., for defendant Wilson M. Smith, Jr.,

Bernard Margolius, and Ben Greenspoon, Washington, D. C., for defendant Raymond Bowden.

YOUNGDAHL, District Judge.

The motions of defendants Bowden and Smith to suppress certain items of evidence upon the ground that those items were illegally obtained by the police came on to be heard by the Court after the jury had been selected and excused pending the outcome of this hearing. The Court heard two days of testimony, and now makes the following findings of fact and conclusions of law.

**I**

Both defendants were arrested on Friday, March 9, 1962, at 9:45 p. m., suspected of a purse-snatching not connected with the robbery charged against them in

the present indictment. The reason the two were arrested was that they were in the neighborhood of the purse-snatching; they roughly fit the general description of the perpetrators of the purse-snatching; and they had not satisfactorily explained to a police officer why they were in the neighborhood. They were brought to police headquarters, Number 13 precinct, for a line-up, but they were not identified by the complainant as having anything to do with the purse-snatching. The 17-year old juvenile, Bowden, was released to his parents at approximately midnight, but Smith, age 20, was kept over night at the jail without any charge having been lodged against him. As of that time, there was no crime of which Smith was even suspected of having committed.

The next morning at 8:45 a. m., Saturday, March 10, Smith was placed in a city-wide line-up at No. 1 precinct. The purpose of this line-up "is to acquaint the detectives working throughout the city with the persons who have been arrested in the city so that they may be identified, perhaps, as connected with some other crime in a precinct other than their own." (Tr. 137). Officer Preston, of Homicide Squad, viewed that line-up, and learned that Smith had been picked up at a place which he knew to be very close to the place where Miksa Merson had been murdered on the street the week before, on March 3. Officer Preston also noticed that Smith was wearing a jacket that appeared to have blood stains on it. At approximately 9:05 a. m., Officer Preston took Smith to the Homicide Squad office for questioning.

There, Officer Preston questioned Smith about his whereabouts the night before, and also about his whereabouts on March 3, the night of the Merson murder. Smith said that he was sure that on March 3, he had entered a movie theatre at about 7:30 p. m., although he could not remember the name of the theatre, the admission price, or the name of the motion picture he had seen. Officer Preston had not questioned Smith about the specific time of 7:30 p. m., which he knew to have been the time of the Merson murder. The officer asked Smith if Bowden had been with him on March 3. Smith responded that he had not.

At 10:05 a. m., Smith consented to have his finger and palm prints taken. Several days later, these prints were found to correspond to prints on an anonymous letter which had been sent to the police on March 8, containing personal effects of the victim.

At 10:30 a. m., Officer Preston asked Officer Eccles to go to Bowden's home to find out if Bowden had been with Smith on March 3.

At about 11:20 a. m., Smith said that he would take a lie-detector test. The test began at 11:30 a. m. and lasted until 2:00 p. m. Officer Preston testified that at the close of the test he concluded that Smith was not truthful, and that "he was, in fact, involved in the homicide." (Tr. 147).

In the meantime, Officer Eccles had gone to the home of Bowden with another officer. Officer Eccles told Bowden's mother that the police wanted to find out if Bowden was with Smith on March 3, and that he wanted Bowden to come with him to headquarters. Bowden's mother said that he could go, and she called for him to get out of bed and come downstairs. Officer Eccles told Bowden that he wanted Bowden to come to headquarters "to try and clear Smith." (Tr. 305). Bowden agreed. Officer Eccles testified that he would not have "arrested" the boy if the boy had refused to come.

About half an hour after Bowden and the officer arrived at headquarters, Officer Eccles noticed that Bowden was wearing a round gold watch with a sweep second hand. Without advising him of his right to remain silent or of his right to have an attorney, Officer Eccles asked Bowden where he had gotten the watch. Bowden said that his mother had given it to

him. Officer Eccles then went to the outer office, where Bowden's mother, who had not come to headquarters in the police vehicle, was by now waiting. She told Officer Eccles that she had not given her son a watch. The officer then returned to Bowden, who changed his story and said that he had gotten the watch from another boy on March 3. He said that when he got it, the watch had a stretch-type band on it, but that he had thrown it away and put on a black cloth-type instead. Officer Eccles knew that Merson's watch had had a stretch-type band. He then told Bowden that he was under arrest for the murder of Miksa Merson on March 3.

When Officer Preston finished giving Smith the lie-detector test, he immediately proceeded to give Bowden the test. Bowden's mother was not asked to give her consent. Officer Preston described Bowden's test as "a peak of tension test," (Tr. 151); it lasted from 2:00 until 6:00 p. m. After Bowden's test was completed, Bowden finally admitted that he *knew* about the crime, but asserted that Smith had committed the murder and had told him, Bowden, about it.

A few minutes after 6:00 p. m., Officer Preston brought Smith and Bowden face to face. Smith still denied any participation, and Bowden retracted his statement accusing Smith. Smith was then taken to the cell block. Bowden now finally broke down, admitted his own involvement, and said that he would show the officers the escape route which had been used after the murder.

At 6:45 p. m., Officer Preston and another officer went with Bowden to the area of the crime. Bowden pointed out where the money and watch had been divided, and where some articles belonging to the victim had been discarded. The officers and Bowden returned to headquarters sometime after 7:30 p. m. Sometime during the evening, Bowden was given what apparently was his first food of the day—a sandwich. At headquarters, Bowden signed a written statement that he had taken the wallet from the victim; that Smith had taken the watch; and that Smith had hit the victim twice with a club, causing the death.

Immediately after this statement was signed, an attorney appeared for the first time, at 8:00 or 8:15 p. m. Bowden's mother had asked the attorney to find out why her son was being held, for which task she paid him $20. The attorney entered the office in which Bowden was being held. Officer Preston heard the attorney tell Bowden "[t]hat if he was involved, that he should tell the truth, and be entirely truthful and clear it up." (Tr. 221). Officer Preston did not hear the attorney advise Bowden that he had a right to remain silent.

Bowden was then turned over to the juvenile squad, placed in the Receiving Home, and charged with homicide.

Between 6.00 p. m. and midnight of that same Saturday, police officers conferred several times with an Assistant United States Attorney in order to determine whether Smith should be brought before the Commissioner. The Government attorney told the police that there was not yet enough evidence to bring Smith before the Commissioner, and that Smith—who had been in custody for roughly 24 hours already—should be detained for a reasonable length of time for further questioning.

On Sunday morning, March 11, beginning at approximately 10:30 a. m., Smith was interrogated by Officer Preston again. This time, Smith broke down, admitted his full participation in the homicide, and said that besides himself and Bowden, a third person—later discovered to be named Holman—also participated. This was the occasion on which the police first learned of Holman's involvement, at 11:30 a. m. (Tr. 172, 223). In the course of his oral confession, Smith admitted that it was he himself who had struck the victim twice with a fallen tree limb in order to take whatever money and valuables the victim (apparently chosen because he happened to

drive up in his automobile to park on the street) had upon his person. Sometime during this oral confession, Smith requested that Bowden come in to listen; so about noon, or shortly thereafter, Bowden was brought from the Receiving Home to the Homicide office for a second confrontation. No attorney was present. At that time, Bowden and Smith called the third person "Red" and collaborated in providing the police with a description which enabled the police to determine the third person's name—Holman. (Tr. 225).

Smith then went with the officers to the scene of the crime and showed them the escape route. In addition, he located a snap-type purse which had belonged to the victim and which Smith had discarded on the night of the murder. Prior to this time, the officers had known nothing about this purse.

They returned to the Homicide office at 2:15 p. m., and a written statement was taken from 2:30 until 3:30 p. m. Between 4:00 and 4:20 p. m., the victim's brother came to the office. Smith and Bowden both admitted to this brother what they had done, and Smith said that he was sorry. Smith was then returned to the cell block, and Bowden, together with Holman—who, since the morning, had also been charged with homicide—were sent to the juvenile Receiving Home.

Smith was taken before the Commissioner the next morning, Monday, March 12, at 10:00 a. m., at which time he was advised of his rights to remain silent and to consult an attorney. No attorney was present when Smith was presented to the Commissioner. Smith had been in custody since Friday night—a total of over 60 hours. During all of this time, he had never been told that he was entitled to have an attorney, although Officer Preston testified that both before the lie-detector test on Saturday and before the interrogation on Sunday, he advised Smith that he did not have to make any statement.

On Wednesday, March 14, the coroner's inquest was held. Smith was present, and was represented by an attorney, employed by the Legal Aid Agency, who advised Smith to make no statement. Holman testified as a witness and was represented by an attorney. Bowden apparently had no attorney of his own.

On Thursday, March 15, in response to a request by Smith made on Sunday, March 11, Officer Preston brought Smith's "girl-friend" to see Smith at the jail. They arrived at about 11:45 a. m. and waited in the rotunda. Shortly after noon, Smith came in. The officer testified that the usual practice was for a prisoner and a relative to talk to each other over a speaker while physically separated by a glass panel. On this occasion, however, Smith, the "girl-friend," and Officer Preston sat together at a table in the jail rotunda. The officer admitted that he was "not unaware" that he might obtain information from this conversation. (Tr. 204). The officer overheard the entire conversation, which included a statement by Smith that he had killed the man although he had intended only to rob him. Smith then turned to the officer and asked if the officer thought Smith needed a lawyer. The officer testified that he then told Smith "that I thought he needed the best lawyer that he could get." (Tr. 187). Smith gave his "girl-friend" the telephone number of a person whom he thought could help obtain a lawyer. Officer Preston then told Smith that he could testify in court to anything Smith might say, but Smith continued talking without a lawyer present. At 12:40 p. m., Officer Preston and the "girl-friend" left the jail.

On Friday, March 23, the Juvenile Court waived its jurisdiction over Bowden, and Bowden was brought to police headquarters. Officer Preston, who had not seen Bowden since Sunday, March 11, and another officer then took Bowden from headquarters to the Commissioner. Bowden asked the officer what a "waiver" meant, and the officer responded that

he would now be tried as an adult. Before he was placed in the U. S. Marshal's cell block, Bowden—according to Officer Preston—asked the officer: "[A]re you going to see me, are you going to talk to me?" And the officer replied that he would talk to him after Bowden had been presented to the Commissioner. (Tr. 195). Bowden was presented to the Commissioner shortly after 10:30 a. m.

Immediately thereafter, Officer Preston went to the cell block to talk to Bowden —again not in the presence of a lawyer— but was detained on another matter and did not see Bowden until about 12:40 p. m. Between then and 1:00 p. m., Bowden talked about the crime again—without a lawyer present—about Holman's involvement; Smith's possibly greater share in the proceeds of the robbery; and Bowden's own purchase of a new watchband. He said that he had bought two sport shirts with his share and had lost the rest in a pool hall.

Officer Preston again saw Bowden on March 29, at which time Bowden described his life at the jail, said that the food was good, and again emphasized that Holman was more involved than Holman had admitted. Bowden said that he wanted to testify against Holman. A lawyer was not present during this conversation.

The Government seeks to introduce five pieces of evidence obtained during the series of events described above:

1. Fingerprints taken from defendant Smith on Saturday, March 10.

2. Statements made by defendant Smith to his "girl-friend" on Thursday, March 15.

3. Statements made by defendant Bowden on Friday, March 23, immediately following his appearance before the Commissioner.

4. The watch seized from defendant Bowden on Saturday, March 10.

5. Testimony of witness Holman.

II

If it were for this Court to decide guilt or innocence on the basis of the series of events described above, there would be no doubt of the decision. But guilt or innocence in a court of law must be established in a particular way—by methods which the Supreme Court has said "commend themselves to a progressive and self-confident society." McNabb v. United States, 318 U.S. 332, 343–344, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943).

For a juvenile, the methods must conform to "principles of 'fundamental fairness,'" and admissions made by a juvenile while still within the "non-criminal and non-punitive" setting of the Juvenile Court are inadmissible in an adult court following a waiver of jurisdiction. Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961).

For an adult, the methods must be free not only of torture, inquisition, and the "third degree," but also of more subtle forms of coercion. Ours is a system in which the Government must accuse a defendant of a crime and then prove its case beyond a reasonable doubt. The defendant need not participate in helping the Government prove its case; he has the constitutional right to remain silent.

In order that courts, juries, and the public may be satisfied that coercion has not been used, and that the defendant knows his rights, the Federal Rules of Criminal Procedure provide that an arrested person shall be brought before a judicial officer, the U. S. Commissioner, "without unnecessary delay" after arrest, in order that the judicial officer may determine whether there is probable cause for the arrested person to be detained, and in order, further, for the Commissioner to inform the arrested person of his rights to remain silent and to have an attorney. These functions are thus taken away from the police, and entrusted to the independent judgment of

the Commissioner. In no uncertain terms, Rule 5(a), 18 U.S.C.A. provides:

"An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person *without unnecessary delay* before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith." (emphasis added)

In order that these important procedures should not become empty words, the Supreme Court has unanimously applied an exclusionary rule to any confessions obtained from an arrested person during a period of "unnecessary delay" in bringing the arrested person before the Commissioner. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). In language which should be clear and commanding to all, that court there declared:

"The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken *to police headquarters in order to* carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession." 354 U.S. at 454–455, 77 S.Ct. at 1359.

■ At the outset, it must be noted that the Government has conceded, as it must under Mallory, that all statements made by defendant Smith after his arrest Friday night and before he was brought before the Commissioner Monday morning are inadmissible. It would be hard for the Court to imagine a more patent violation of the clear command of Rule 5(a) and Mallory. It is indisputable to this Court that defendant Smith, after the identification on another robbery charge failed, was illegally held in custody on suspicion and solely for the purpose of interrogation. At no time during his long detention of 36 hours before his written confession was obtained did he have the benefit of legal advice. Even assuming arguendo that the officers were justified in holding him until Saturday evening, March 10, 24 hours after being brought into custody, certainly at least by that time he should have been either released or brought before the Commissioner. Instead, as the Assistant United States Attorney testified, it was his opinion that the defendant could be held for an additional reasonable time for interrogation. What he meant, or what the officers would have considered "an additional reasonable time" was not made clear by the testimony. It seems to the Court that this interpretation of Rule 5 completely overlooks its plain language and eliminates the protection it was designed to afford defendants.

■ The Government has also conceded, as it must, that under Harling, supra, all statements made by the juvenile defendant Bowden, while within the juris-

diction of the Juvenile Court, are inadmissible in adult proceedings following a waiver by the Juvenile Court. Concerning the written and oral confession obtained from the minor before his waiver, there is even stronger reason (if such there can be) for striking down these confessions. This 17-year old boy was brought to police headquarters without a warrant; he was not advised that he was entitled to counsel nor that he did not have to make a statement. And yet the officer, upon observing a wrist watch, proceeded to question the boy concerning the watch, and when the officer concluded that the answers seemed suspicious, he placed the boy under arrest. A lie-detector test was then given without his mother's permission, and the oral and written confessions followed in due course. These confessions must, of course, be suppressed.

But clear rulings of the Supreme Court and of the Court of Appeals require this Court to go further and to exclude four items of evidence which the Government seeks to introduce against these defendants. Two items concern defendant Smith, and two concern defendant Bowden. Each of these evidentiary items that must be excluded will now be considered separately.

1. *Fingerprints taken from defendant Smith on Saturday, March 10.*

■ These fingerprints were secured by the police during the period of "unnecessary delay," and so must be suppressed.

The Court of Appeals has held that fingerprints secured during detention following an illegal arrest are inadmissible in evidence. Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958). Assuming arguendo that the arrest of Smith was legal, the illegality now discussed stems, instead, from the "unnecessary delay" in bringing defendant Smith before the Commissioner, as Rule 5(a) requires. There is no doubt, however, that the Court of Appeals would apply to fingerprints taken during the illegal *delay* the same principles which it applied to fingerprints taken following an illegal *arrest*. The following language from Bynum makes that clear:

"* * * In these situations it is deemed a matter of overriding concern that effective sanctions be imposed against illegal arrest and detention and the risks of overreaching inherent in such action. Even though highly probative and seemingly trustworthy evidence is excluded in the process, this loss is thought to be more than counterbalanced by the salutary effect of a forthright and comprehensive rule that *illegal detention shall yield the prosecution no evidentiary advantage in building a case against the accused.* [emphasis added] All of this is bottomed on the Constitution itself. The Fourth Amendment makes protection of the individual against illegal seizure or arrest a constitutional imperative. In the cited cases judicial authority over the manner on which justice shall be administered is exercised in a way calculated to implement the constitutional guarantee.

"True, fingerprints can be distinguished from statements given during detention. They can also be distinguished from articles taken from a prisoner's possession. Both similarities and differences of each type of evidence to and from the others are apparent. But all three have the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention. If one such product of illegal detention is proscribed, by the same token all should be proscribed." 104 U.S.App. D.C. at 370, 262 F.2d at 467.

The Bynum case, therefore, not only states the general principle that an "illegal detention shall yield the prosecu-

tion no evidentiary advantage in building a case against the accused," but specifically applies this general principle to fingerprints. The Court is bound to follow that opinion and must, therefore, suppress the fingerprints in the present case.

2. *Statements made by defendant Smith on Thursday, March 15.*

▮▮▮ The recent case of Killough v. United States, 113 U.S.App.D.C. ——, —— F.2d ——, (October 4, 1962), requires this Court to suppress the statement made by defendant Smith on Thursday, March 15, because that statement was a direct product of the tainted statements made on Sunday, March 11.

Killough states the basic proposition that when a trial court is faced with two confessions, one of which preceded the appearance of the defendant before the Commissioner, and the other of which followed such appearance before the Commissioner, the court must exclude the second if it is the product of the first.

In Killough, the same officer who had taken the tainted confession was present at the later confession. The same is true in the present case. The police officer present on Thursday was the same officer who on the previous Saturday, March 10, had given defendant Smith a prolonged lie-detector test, and who on Sunday, March 11, had elicited from defendant Smith an oral confession and had then taken him to the scene of the crime in order to trace the escape route. The presence of this same officer would clearly lead defendant Smith to believe that there would be no point in concealing on Thursday what he had already revealed the previous Sunday. Therefore, unless the Court can find some event between Sunday and Thursday which might have brought home to defendant Smith his right to remain silent, the Court must suppress the Thursday confession.

Killough clearly states that the warning of the Commissioner is not sufficient to bring this right effectively to the at-

tention of an accused who has already given a confession. There must be, in addition, either a sufficient lapse of time, or the meaningful advice of counsel, or both. In the instant case, there was neither. The lapse of time between Sunday and Thursday had no appreciable effect upon the relationship between the officer and defendant Smith. And the only representation by counsel was at the coroner's inquest on Wednesday night. Such representation was fleeting, and strictly limited to those proceedings. There was, in short, no event between Sunday and Thursday sufficiently decisive to erase the effects of the first confession. The Court therefore finds that the Thursday confession was the direct result of the Sunday confession, and hence, under Killough, inadmissible.

3. *Statements made by defendant Bowden on Friday, March 23.*

▮▮▮ On March 23, the Juvenile Court waived its jurisdiction over defendant Bowden in order that Bowden might be tried in adult proceedings in the District Court. "[I]n the District Court proceeding the Federal Rules must be observed." Harling, supra, 111 U.S.App. D.C. at 175, 295 F.2d at 162. Thus the principles of Mallory and Killough apply to the statement made by defendant Bowden to Officer Preston following his waiver and his subsequent appearance before the Commissioner on the same day.

It is true that defendant Bowden was brought before the Commissioner "without unnecessary delay" from the time of his waiver by the Juvenile Court.

But it does not follow from the fact that Rule 5(a) was thus satisfied that any voluntary statements made by defendant Bowden after appearing before the Commissioner are admissible. Surely, if Killough requires this Court to inquire into the causal connection between two confessions by an adult, one of which preceded and one of which followed the adult's appearance before the Commissioner, then Killough and Harling, taken

562

together, require this Court to inquire into the causal connection between two confessions by a juvenile, one of which preceded and one of which followed the juvenile's hearing before the Commissioner. For this Court to hold otherwise would be to give the child *less* protection than the adult must receive. Such a holding would fly in the face of Harling, which requires *greater* protection for the child, in accord with "principles of 'fundamental fairness.'" 111 U.S.App. D.C. at 176, 295 F.2d 161.

In the instant case, the confession of defendant Bowden immediately following his waiver and appearance before the Commissioner is a direct product of his earlier confession while he was in "the non-criminal and non-punitive setting" of the Juvenile Court. Harling, supra at 176, 295 F.2d at 163. Indeed, just as in the case of defendant Smith, so in the case of Bowden did the same officer take both the first and second confessions. Moreover, defendant Bowden's only contact with an attorney was when he was brought into police headquarters on Saturday, March 10, at which time his mother secured an attorney to find out why defendant Bowden was being held. That task accomplished, the attorney apparently disappeared from the picture. His only advice to the boy was to tell the truth and clear the whole matter up. And finally, the interval of 13 days between the first and second confessions only reinforces the causal link between the two. For during all of that time, defendant Bowden was subject to "the flexible and informal procedures of the Juvenile Court", Harling, supra, at 177, 295 F.2d at 164. It is no wonder then, that on the way to his appearance before the Commissioner, defendant Bowden asked what a waiver meant. There is no indication that the officer who accompanied him on that trip, and who had already secured the one confession, told him anything about the stricter evidentiary standards of adult proceedings or about the right of silence applicable to

criminal proceedings. In the face of the relationship which the officer had by that time established with the child, the Commissioner's warning fell upon uncomprehending ears. It is the officer who provides the link between the first and second confessions, and the second confession must therefore be suppressed as a direct result of the first.

*4. The watch seized from defendant Bowden on Saturday, March 10.*

The Government seeks to introduce into evidence a watch which allegedly belonged to the victim and which was taken from defendant Bowden's arm approximately thirty minutes after he was brought to police headquarters on Saturday, March 10. The watch must be suppressed, however, because it was illegally seized from defendant Bowden.

 It is a long-established principle that search and seizure without a warrant are legal if the search and seizure are incidental to a lawful arrest. It is necessary, therefore, to determine whether Bowden was lawfully arrested.

 The Government contends that Bowden was not "arrested" until Officer Eccles formally told him that he was under arrest, at police headquarters. The Court, however, finds that defendant Bowden was "arrested" at the moment the officer entered the Bowden house and requested that the 17-year old come with him to headquarters. At that moment, in any realistic sense, defendant Bowden was forced to submit to the officer's "request," and was in custody. In the words of the Supreme Court, his "liberty of movement" was "restricted." Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The Court of Appeals, moreover, has referred with approval to the following definition of "arrest":

"[I]n order for there to be an arrest it is not necessary that there be an application of actual force, or manual touching of the body, or physical restraint which may be visible to the

eye, or *a formal declaration of arrest.* It is sufficient if the person arrested understands that he is in the power of the one arresting, and submits in consequence." Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555, 563–564 (1961). (Emphasis added).

It is indisputable that in the present case, defendant Bowden—who upon first view is obviously a juvenile—felt himself in the power of the officer, and submitted in consequence. It is noteworthy, in this connection, that the officer admitted to the Court that no 17-year old juvenile whom he has "requested" to come to headquarters has ever refused. It is also noteworthy that the defendant's mother was not told that she could go with her son to police headquarters, and that she therefore had to find her own means of transportation. By the time defendant Bowden left home, he was in "custody" and "under arrest."

 It therefore becomes necessary to determine whether the arresting officer had "probable cause" to make this arrest without a warrant. The Court finds that he did not. The arresting officer, at the time of arrest, had no basis for connecting defendant Bowden with the Merson murder, or with any other crime. He was merely told by the officer questioning defendant Smith that he wanted to find out if Smith and Bowden were together on March 3. Officer Eccles testified that he did not see the watch until after they had arrived at police headquarters, and that it was the watch which first alerted him to a possible connection with the Merson murder. In short, defendant Bowden was arrested merely for the purpose of investigation—a purpose which is insufficient to meet the legal requirement of "probable cause."

 Since defendant Bowden was not lawfully arrested, the subsequent seizure of the watch was tainted with illegality. The watch, therefore, must be suppressed.

## III

 The Government seeks a ruling which would admit into evidence the testimony of one Holman, a juvenile who allegedly participated in the crime. At the trial, he would presumably identify both Smith and Bowden as participants and describe in detail exactly what occurred. He is, as the Government attorney stated to the Court, the Government's chief witness.

The Court has a firm and abiding conviction that the testimony of Holman should be excluded because the police first learned of Holman's existence and participation from the tainted statements of Smith and Bowden on Sunday. The Court is convinced that the testimony of Holman is a direct product of these tainted statements, and that such testimony should likewise be excluded as tainted.

Nevertheless, this Court has decided, after long and deep consideration, that the doctrine of law which would exclude Holman's testimony has not yet been squarely applied by the Court of Appeals to violations of Rule 5(a). Indeed, only two weeks ago, that Court, sitting en banc in the Killough case, supra, made it clear that the question was still an open one.

This very trial Court had been faced in the Killough case with an argument by the defendant to the effect that the location of the victim's body had been discovered by tainted statements made by the accused during a period of "unnecessary delay," and that all testimony concerning that body should therefore be excluded because such testimony was the "fruit of the poisonous tree."

In that case, it was undeniable that the existence of the body and the testimony concerning the body were the direct product of the accused's tainted statements. The only question in this Court's mind was whether the doctrine of the "fruit of the poisonous tree" could be applied, when a prior Court of Appeals' case had suggested that the doctrine

should not be applied to violations of Rule 5(a). Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335 (1960). I therefore held that solely because of this prior case, the testimony was properly admitted into evidence. United States v. Killough, 193 F.Supp. 905, 922 (D.C.1961).

Faced with this question when Killough was appealed, four members of the Court of Appeals wrote:

"Appellant contends that the coroner's testimony stemmed from the illegally procured initial confessions and, therefore, was inadmissible as the 'fruit of the poisonous tree.' Since we reverse for the reason previously set forth [the inadmissibility of the statement made by the accused after his hearing before the Commissioner] it is not necessary to pass upon the admissibility of the coroner's testimony. Appellant in any event is entitled to a new trial and it is possible that the coroner may not be called to testify. With the confessions out of the case the question whether the coroner's testimony should be admitted may not arise, or may arise in a very different context at a new trial. Accordingly, we do not decide it." 113 U.S.App.D.C. at ——, —— F.2d at ——.

Four members of the Court of Appeals dissented from the Court's failure to deal with the issue, stating that they

"suggest that four of the judges who vote to reverse have an absolute and inescapable obligation to pass on this issue since it will inevitably arise in a new trial and the District Court should not be left without guidance on this critical issue. For such clarification as is possible in light of failure to rule directly on the issue, it should be noted that the four dissenting judges would admit evidence of the body while four judges do not state any position; only one judge would suppress all evidence of the body as 'fruit of the poisonous tree.' In this posture it

seems clear there is no holding in this case that evidence of the victim's body should be suppressed on retrial." 113 U.S.App.D.C. at ——, —— F.2d at ——.

Yet even as the dissent spoke in this manner about the testimony concerning the body, the majority opinion adopted the language of the "poisonous tree" doctrine when it declared that the oral confession was obtained so soon after the illegally-procured confessions that the former was "the fruit of the latter." 113 U.S.App.D.C. at ——, —— F.2d at ——. It is, therefore, unclear to this Court whether the Court of Appeals left open the question of the propriety of the "poisonous tree" doctrine, or merely the application of that doctrine to the corpus delicti.

To reinforce the uncertainty as to whether the "fruit of the poisonous tree" doctrine applies or does not apply to evidence obtained as a result of violations of Rule 5(a), the Government has called to the attention of the Court the case of Payne v. United States, 111 U.S.App. D.C. 94, 294 F.2d 723 (1961), cert. denied 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961), where the Court of Appeals described a prior case as rejecting "the sort of 'fruit of the poisonous tree' argument advanced in the instant case." 111 App.D.C. at 97–98, 294 F.2d at 727. Again, this Court is unclear whether it was the doctrine, or a particular application of that doctrine, which was condemned in Payne.

Solely because of the uncertainty which these statements leave in the Court's mind, this Court will admit into evidence the testimony of Holman. Nevertheless, this Court wants to make it abundantly clear that in its firm belief, the basic principle of Mallory, as extended in Killough, is that in order to make effective the important protections of Rule 5(a), the courts must exclude *all* evidence *directly produced* by a violation of that Rule. "[K]nowledge gained by the Government's own wrong cannot be used

by it * * * ." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

Of course, there will always be questions of whether, on the one hand, evidence was *directly produced by* the illegal detention, or whether, on the other hand, the connection between the two pieces of evidence is so attenuated, so speculative, so far-fetched, that the later evidence cannot properly be said to "result from" the earlier. See Gregory v. United States, 97 U.S.App.D.C. 305, 231 F.2d 258 (1956), cert. denied 352 U.S. 850, 77 S. Ct. 69, 1 L.Ed.2d 61 (1956).

This Court feels that despite the vicissitudes of the application of the "poisonous tree" doctrine, the principle which that doctrine was intended to express has consistently been applied to violations of Rule 5(a). Thus in consideration of the question of two confessions, one prior to the hearing before the Commissioner, and the other following such hearing, the issue has usually been stated in terms of whether the second confession was "independent" of the first. See Jackson v. United States, 106 U.S.App. D.C. 396, 273 F.2d 521 (1959); Killough, supra, 113 U.S.App.D.C. at ——, —— F.2d at ——, n. 5. Indeed, in the Killough case itself, this very trial Court had found the second confession to be "independent" of the first, but the Court of Appeals reversed essentially on the ground that the short time between the two, the complete absence of counsel in the interval, and the presence at the "reaffirming" confession of the very officers who had taken the tainted confession— all combined to make the second confession legally *dependent* upon the first. There should thus be no uncertainty as to the legal standards to be applied, however differently judges might apply those standards to particular situations.

However, there appears to this Court to be no rational basis for distinguishing between a tainted confession which *produces* a later confession, and a tainted confession which *produces* a witness who participated in the crime. The Court of Appeals in Bynum, supra, could find no distinction between fingerprints obtained during an illegal detention, and confessions obtained during a similar period. Both, the Court said, have "the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention. If one such *product of* illegal detention is proscribed, by the same token all should be proscribed." 104 U.S.App. D.C. at 369–70, 262 F.2d at 467 (emphasis added). And in Killough, the Court specifically clarified its opinion in response to the dissenters by stating: "Our opinion excludes only *evidence* which is *due to* a violation by the police of their duty under Rule 5(a)." 113 U.S.App.D.C. at ——, —— F.2d at ——, para. 7 (emphasis added). The Killough court itself thus spoke not only of confessions, but of "evidence" generally. Indeed, a special standard for confessions would be indefensible.

The Government argues that the Payne case, supra, is "analogous to" the instant case. The Court vigorously disagrees. In Payne, the existence of the identifying witness was discovered in the police file of complaints similar in nature to the one on which the accused had been brought into headquarters. The only issue was whether that witness could testify at the trial even though, at the request of the police, the witness had identified the accused during a period of "unnecessary delay" in bringing the accused before the Commissioner. The Court there held that the witness could testify.

Here, by profound contrast, it is the very existence of the identifying witness, Holman, which was unknown to the police until defendant Smith told the whole story on Sunday morning, long after Smith should have been brought before the Commissioner. Thus in the present case, the violation of Rule 5(a) clearly and directly produced the Government's chief witness; in Payne, by contrast, the

violation of Rule 5(a) had nothing to do with the discovery of the identifying witness in the police files.

Thus, if this Court were free to decide this question according to principles which seem clearly applicable, this Court would exclude the testimony of Holman. But the Court has reluctantly concluded that in view of the language in Killough, it would be presumptuous for this Court to close a question which the Court of Appeals so recently and so definitely left open.

## IV

On March 3, a brutal murder was committed. These defendants are charged with murder in the first degree and murder in the course of perpetrating a robbery—both of which may result in capital punishment, and with a third charge of robbery. Needless to say, in view of the heinous nature of these offenses, a serious responsibility is placed upon this Court.

Nevertheless, our Supreme Court has repeatedly emphasized that the protections provided by the Constitution, laws and rules of court are to be given to all defendants—regardless of the character of the defendant and regardless of the viciousness of the offense. If these protections are to be discarded because of the public's aversion to the atrocity of the offense, then we should erase from the marble facade of the Supreme Court the words "Equal Justice Under Law."

The Court feels obliged to point out that if the defendants are convicted largely on the basis of Holman's testimony, and if the Court of Appeals thereafter reverses those convictions on the ground that Holman's testimony should not have been admitted, the resulting inability of the Government to secure a conviction—barring some new evidence—will not be wholly the responsibility of the courts. Indeed, the evidentiary questions which this Court has been required to consider would never have arisen if the clear statutory requirement of Rule 5(a) had been carried out by the police department.

It is clear that the advice given to the police officer on Saturday night by the Assistant United States Attorney to continue to hold defendant Smith for a further "reasonable time" was for the purpose of enabling the police, during the *extended* period of what this Court considers unnecessary delay, to build a case against both defendants. Yet it is precisely this result which Rule 5(a) and Mallory were designed to prevent. It would be well to *restate* the language the Supreme Court used in Mallory:

> "The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on "probable cause." *The next step* in the proceedings is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined." 354 U.S. at 454, 77 S.Ct. at 1359. (Emphasis added).

It would also be well to recall the important task which the Commissioner performs in deciding this issue of probable cause for an arrest. It is the existence of the Commissioner which is supposed to protect all citizens from the kind of abuse of police process which occurred in the instant case. If the Commissioner alone is not sufficient to secure that protection, then the courts must continue to fashion evidentiary rules which will bolster the Commissioner's strategic importance as a judicial officer who stands between the police and the citizens.

It seems strange that in view of the long-continued discussion of the Mallory rule, Rule 5, and arrests on suspicion and for investigation, see Report and Recommendations of the Commissioners' Committee on Police Arrests for Investigation (July, 1962, the so-called "Horsky Report"), that the activity which took place in order to secure the evidence at issue here, should have occurred at all. The fact that it did occur

indicates the need for continuing education of police officers by the United States Attorney's office as to the law on arrests, detention, and the securing of confessions. It should be said in fairness to the officers and the United States Attorney's office that the evidence in issue herein was obtained before the decision in the Killough case. Nevertheless, that fact makes even stronger the need for continual communication between the courts, the police, and the United States Attorney's office. For it is only if the police are kept abreast of the continuing court refinements in the rules of evidence that illegal arrests on suspicion and violations of Rule 5 and Mallory will be eliminated. It should also be stated that, by the same token, for the police to obtain evidence illegally is to take away from the public, protections to which the public is entitled: the conviction of the guilty.

Because of the importance of such communication with the police, this Court is ordering that a full transcript of this hearing and of this memorandum be submitted to the Commissioners of the District of Columbia for such study and action as they deem appropriate in order to eliminate further violations of Rule 5(a) and Mallory.