Wilson M. SMITH, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

Raymond BOWDEN, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 17466, 17534.

United States Court of Appeals
District of Columbia Circuit.

Argued April 24, 1963.

Decided Sept. 26, 1963.

Petition for Rehearing En Banc
Denied Nov. 18, 1963.

Mr. Kenneth D. Wood, Washington,
D. C., (appointed by the District Court)
for appellant Wilson M. Smith, Jr.

Mr. Bernard Margolius, Washington,
D. C., with whom Mr. Ben Greenspoon,
Washington, D. C., (both appointed by
the District Court) was on the brief, for
appellant Raymond Bowden.

Mr. David C. Acheson, U. S. Atty.,
with whom Messrs. Charles T. Duncan,
Principal Asst. U. S. Atty., and Frank Q.
Nebeker and William H. Willcox, Asst.
U. S. Attys., were on the brief, for ap-
pellee.

Before BAZELON, Chief Judge, and
BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

These are appeals from murder and
robbery convictions in which there is
urged upon us the novel point that the
testimony of an eyewitness to the crime
must be suppressed because the police
learned from appellants, during a period
of illegal detention, of the existence and
identity of such an eyewitness. In short
it is argued that because the confessions
made during the "unnecessary delay" are
inadmissible, the testimony of an eyewit-
ness to the crime must also be suppressed
because the existence of the eyewitness
was revealed to police by appellants dur-
ing the same period of time.

Appellant Smith, in No. 17466, was
found guilty of so-called felony murder,
D.C.Code Ann. § 22–2401 (1961), of
second degree murder and of robbery.
Bowden in No. 17534 was found guilty

of robbery. Neither appellant testified and the evidence as to the events comes from the eyewitness whose testimony was sought to be suppressed.

Undisputed testimony from Philip Holman, the challenged witness, shows that Smith and Bowden set out with Holman, age 14, one evening from Bowden's home. By 7:45 p. m. the trio had reached Kalorama Park, where they separated, Smith continuing on one side of the street while Bowden and Holman remained on the other. Holman's testimony at the trial was that a man got out of a car and Smith approached him from behind and beat him repeatedly on the head, using a tree limb as a club. Bowden immediately crossed the street to join Smith and, after plundering the body of the victim, the two ran from the scene of the crime, with Holman following, to Dupont Circle. There they divided the stolen money.

The victim was Miksa Merson, a 65-year-old pianist and music teacher. He had been struck down a few steps from his home at 2314 Ashmeade Place, N. W. Within minutes a passerby discovered Merson badly beaten and covered with blood. Emergency treatment at Georgetown Hospital was unavailing and he died shortly after reaching the hospital.

The police had few clues. They discovered the club used in the killing and two cards dropped from Merson's wallet. Five days after the crime the Chief of Police received an envelope from an unknown source containing an anonymous note and eleven credit and identity cards representing personal papers of the deceased. One of the cards contained an identifiable palm print. The police also knew that the dead man's gold watch was missing. Six days after the slaying the police did not know how many persons were involved in the killing, nor did they have any "leads" as to the identity of the killer.

On Friday evening, March 9, the police arrested Smith and Bowden in connection with another robbery in the vicinity of the Merson killing. Their arrest was unrelated to the Merson killing for at this time Smith and Bowden were not linked to that case. When the victim of the second robbery failed to identify either appellant, Bowden, the juvenile, was released, but Smith was detained overnight for the purpose of presenting him in a line-up the next morning. We will return later to the legal questions raised by detaining Smith in these circumstances.

Detective Preston, the homicide officer primarily responsible for the investigation of the Merson murder, observed Smith in the line-up on Saturday morning March 10, and learning of the circumstances of his arrest suspected a connection with the Merson case. He sent for Smith and questioned him that morning; at 10:05 Smith's fingerprints and palm prints were taken. At about 11:20 Smith took a polygraph examination, which was completed at 2:00 p. m.

Meanwhile, at 10:30 a. m., Officer Eccles went to Bowden's home and, after Bowden agreed to accompany him, took him to the homicide office, where he remained for about a half hour without questioning. Eccles noticed that Bowden was wearing a watch matching the description of the watch believed to have been taken from Merson. When Bowden could not adequately account for possession of the watch, Eccles retained it. The watch was later definitely identified as Merson's. On completion of a polygraph test given at his own request, Bowden was questioned by Detective Preston at 2:00 p. m. Bowden confessed, implicated Smith and offered to aid in a reenactment of the events. This he did, after which he signed a written statement admitting his role in the crime and describing Smith's part.

On Sunday morning Smith, who was now in his second day of detention without being presented to a judicial officer and who had not yet admitted involvement in the crime, was questioned. Smith spoke freely and willingly at the Sunday morning interview and confessed to the murder. In this oral confession Smith referred to a third person at the

scene of the crime. A few minutes after Smith's confession, Bowden arrived at the homicide office and the two repeated their confessions. Both referred to the third person as a boy called "Red," told the police the general area where he lived, and told them that a picture of "Red" was in police records. From these leads the police were able to locate Holman.

On these appeals it is urged (1) that it was error to receive Holman's testimony because the police found this witness as a result of information obtained while appellants were illegally in custody and (2) that it was error to admit in evidence Smith's palm print obtained from him on the day before trial, which palm print corresponded with the palm print on the automobile registration card of the decedent.

The District Court correctly ruled that oral and written confessions were inadmissible because they were made during a period of illegal detention. The prosecution conceded that the Mallory case was controlling as to the confession of Smith, and the Harling[1] case controlled as to Bowden.

In essence these appeals present the familiar "fruit of the poisonous tree" argument but in a novel form not unlike that presented in Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723 (1961), cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83. The crucial evidence against Smith was the testimony of Holman, the eyewitness to the crime.

Courts have gone a long way in suppressing evidence but no case as yet has held that a jury should be denied the testimony of an eyewitness to a crime because of the circumstances in which his existence and identity was learned. However, in our view, the relationship between the inadmissible confessions and Holman's testimony in the District Court months later is so attenuated that there is no rational basis for excluding it. No case has been cited to us in which the testimony of an eyewitness or factual witness has been excluded because his identity was discovered as a result of disclosures made by an accused during detention violative of Rule 5(a) Fed.R. Crim.P. Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958), is not applicable. Cf. Bynum v. United States, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960).

The District Judge correctly read this court's holding in Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241 (1962), as not requiring the exclusion of Holman's testimony. Neither the Killough holding, the Mallory holding nor any other case would warrant excluding Holman's testimony. The fact that the *source* of evidence is "tainted" by violation of constitutional or statutory provisions has not precluded the use of that evidence in every circumstance. See Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Compare Lockley v. United States, 106 U.S.App. D.C. 163, 166, 270 F.2d 915, 918 (1959) (dissenting opinion); see also Barkley v. United States, 116 U.S.App.D.C. ——, 323 F.2d 804, p. 805 (1963) n. 1.

Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions. But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, "speak for themselves." The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.[2]

1. [Harling v. United States] 111 U.S.App. D.C. 174, 295 F.2d 161 (1961).

2. This is illustrated here by the circumstance that when initially located Hol-

The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.[3]

We dealt with this problem recently in a different factual setting in which we rejected the very "fruit" type argument made by appellants here. In Payne v. United States, supra, Judge Washington, speaking for a unanimous court, said:

"In this case appellant's lengthy detention produced two things— Warren's identification of Payne [at a lineup], and Payne's admission of guilt. The latter, the admission, was excluded from evidence by the trial judge under the rule in Mallory— rightly, we think, though the point is not before us for decision. * * *

"Appellant says that but for his detention he 'would have blended back into the mass of the population', and would have remained at large. He cites our ruling in Bynum v. United States, 1958, 104 U.S.App. D.C. 368, 262 F.2d 465, * * *. But we later affirmed Bynum's conviction after a second trial, at which the prosecutor introduced a fingerprint other than that taken during the period of illegal detention, *but which he was able to obtain because he knew Bynum's identity as a result of the fingerprints taken during that period.* See 1960, 107 U.S.App. D.C. 109, 274 F.2d 767. Implicit in our second holding was a rejection of the sort of 'fruit of the poisonous tree' argument advanced in the in-

stant case." (Emphasis added.) 111 U.S.App.D.C. at 97–98, 294 F.2d at 726–727 (1961).

Judge Washington concluded that to suppress the testimony of the witness Warren simply because he had identified Payne as the robber at a police line-up during his illegal detention would be "unthinkable." Mr. Justice Jackson would appear to have had something like this in mind when he expressed unwillingness to debase constitutional doctrine "by making of them mere technical loopholes for the escape of the guilty. The petitioners have had fair trial and fair review. The people of the State are also entitled to due process of law." Stein v. People of State of New York, 346 U.S. 156, 196, 73 S.Ct. 1077, 1098, 97 L.Ed. 1522 (1953).

■■ We find no error in the admission of the palm print of Smith taken the day before trial for purposes of comparison with the palm print on the victim's credit cards. Unlike the situation in Bynum v. United States, 104 U.S.App. D.C. 368, 262 F.2d 465 (1958), appellant here was in lawful custody at the time his prints were recorded. Cf. Bynum v. United States, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960) (per curiam). And it is elementary that a person in lawful custody may be required to submit to photographing, United States v. Amorosa, 167 F.2d 596, 599 (3d Cir., 1948), and fingerprinting, United States v. Krapf, 285 F.2d 647, 650–651 (3d Cir., 1961), as part of routine identification processes. United States v. Kelly, 55 F.2d 67, 83 A.L.R. 122 (2d Cir., 1932).

man gave no information adverse to appellants; only after reflection and the interaction of these faculties of human personality did Holman eventually relate to the jury the events of the night of the killing. These factors in part account for the rule allowing a party to cross-examine his own witness on a claim of surprise and ultimately to impeach his own witness.

3. This distinction is not foreclosed by the recent Supreme Court decision in Wong Sun v. United States, 371 U.S. 471, 83

S.Ct. 407, 9 L.Ed.2d 441 (1963), as the dissenting opinion suggests; in Wong Sun, it was not eyewitness testimony that the Supreme Court held subject to suppression, but rather a package of narcotics. Moreover, a statement excluded by the Court was uttered by one of the defendants at the time of an unconstitutional police entry and arrest. 371 U.S. at 485–486, 83 S.Ct. at 416, 9 L.Ed.2d 441. Here it is not some *prior* utterance of appellants or Holman which is sought to be suppressed, but the testimony of an eyewitness to an event.

■ Appellant Bowden contends he was entitled to a judgment of acquittal on his robbery indictment at the close of the government's case. Here, as in Hunt v. United States, 115 U.S.App.D.C. 1, 316 F.2d 652, 654 (1963), "appellant fragments the Government's case and then seeks to show that each fragment considered in isolation is consistent with an hypothesis of innocence." See United States v. Masiello, 235 F.2d 279, 283 (2nd Cir.) cert. denied sub nom., Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956). But the jury was obliged to determine whether the government's evidence as a whole established Bowden's guilt of the robbery beyond a reasonable doubt. The totality of the evidence, direct and circumstantial, was sufficient to warrant a verdict of guilty.[4]

The judgments of the District Court are

Affirmed.

BAZELON, Chief Judge (dissenting).

To "avoid all the evil implications of secret interrogation," McNabb v. United States, 318 U.S. 332, 344, 63 S.Ct. 608, 87 L.Ed. 819 (1943), Rule 5(a) of the Federal Rules of Criminal Procedure requires police to bring an arrested person before a committing magistrate "without unnecessary delay." Experience shows the temptation to violate this command is so great that police will not voluntarily comply, and the legislature and executive have been either unable or unwilling to employ effective methods to insure compliance.[1] To protect the rights of arrested persons, the Supreme Court has found it necessary to exclude evidence obtained through violation of Rule 5(a). McNabb v. United States, supra; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The circumstances revealed by the record in this case plainly demonstrate that these rights will be a dead-letter unless courts continue to apply McNabb-Mallory when evidence is obtained in violation of the Rule.

Not only evidence directly obtained by illegal detention of a suspect but also the "fruit" or "product" of information so obtained must be excluded from use at

---

4. The record discloses that Smith came to Bowden's home early in the evening of the killing and said to Bowden "something about making money," after which Smith, Bowden and Holman went to the vicinity of the crime. Smith, Bowden and Holman were observed by one witness as they were walking through a park immediately adjacent to the place of the attack; when Smith drew near her, the witness became frightened and screamed whereupon Smith said, "I am not going to hurt you; don't be afraid." According to Holman's testimony, Smith at this time was "a little in front of" Bowden and Holman and near enough so that Holman heard Smith's statement to the woman. Holman testified that he, Smith and Bowden continued through the park, Smith picked up a tree branch (later used to club Merson) and told Holman "to put it under [his] coat [because] he [Smith] didn't want the police to see it." Holman's testimony further showed that he and Bowden were directly across the street from where the attack occurred and near enough so that Holman heard the blows on Merson's head. Shortly after Smith struck Merson, Holman saw Bowden "go across the street" "to see what [had] happened to Smith." Smith and Bowden then ran past him and he followed.

Immediately after the attack and before Merson lost consciousness, the witness Branch found Merson and asked him what had happened, to which Merson replied "They hit me." Branch asked "Who hit you?" and he repeated "They hit me."

Holman's testimony concerning division of Merson's money was that after the attack Smith gave Bowden something over twenty dollars but gave Holman only ten dollars commenting "What do you expect for nothing. * * * if you just came across the street and searched the man's pockets, you would have gotten some more."

1. For a discussion of proposed methods, see Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn.L. Rev. 493 (1955).

trial.[2] What is a "fruit" or "product" must be determined in the light of the need to discourage violation of the Rule. In the present case, police detained appellant Smith and questioned him intermittently for forty hours [3] before eliciting both his confession and substantial clues to the identity of an eyewitness. Since the clues thus obtained enabled the police to locate the witness Holman with little difficulty and thereafter obtain his testimony,[4] the link between the illegal questioning of Smith and the testimony of Holman was not attenuated.[5] To admit Holman's testimony puts a premium on violation of Rule 5(a) and provides an incentive for continuing to violate it.[6]

I would therefore reverse Smith's conviction and order a new trial. Since Holman's testimony implicated not only Smith but his co-defendant Bowden as well, I would also reverse and order a new trial as to Bowden. Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943); see MacDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

---

2. Killough v. United States, 114 U.S.App. D.C. 305, 315 F.2d 241, 244 (1962) (later confession held inadmissible as the "fruit" of an earlier one); see also concurring opinion of Judge Wright, id. at 316, 315 F.2d at 252; United States v. Smith and Bowden, 31 F.R.D. 553, 563–67 (D.D.C.1962) (Judge Youngdahl's Memorandum on Motions to Suppress. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

3. Even after obtaining the confession and the information, the police did not take Smith before a commissioner until the following morning (Monday). His detention thus totaled sixty hours.

4. After Smith had described Holman, the juvenile Bowden also did so. But the record shows that Bowden's description resulted from Smith's and was not an independent lead to Holman. Record, pp. 223–25.

5. Nor do I think attenuation is shown by the refusal of Holman, who testified against appellants at trial, to do so at the coroner's inquest.

6. The majority would except the oral testimony of a "living witness" from the "fruit of the poisoned tree" doctrine, on the ground that a witness is an "individual human personality" possessing "attributes of will, perception, memory and volition." The reasoning seems to be that since these human faculties operate in deciding what evidence the witness will give, the decision is an intervening voluntary act which dissipates the taint of the original illegality. But this contradicts Wong Sun v. United States. In that case, where an "individual human personality" named Yee gave narcotics to the police, the Supreme Court excluded the narcotics as "poisoned fruit" because the police learned of Yee from the illegally-arrested Toy. 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 44 (1963). Thus it appears that the decision to give certain evidence is not the kind of intervening voluntary act of an "individual human personality" that dissipates the taint of original illegality.