**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Socorro CHAIDEZ–CASTRO and Domingo Rodriguez-Macias, Defendants-Appellants.**

**Nos. 17829, 17830.**

United States Court of Appeals,
Seventh Circuit.

Aug. 28, 1970.

Robert S. Bailey, Chicago, Ill., for defendants-appellants.

William J. Bauer, Thomas A. Foran, U. S. Attys., Allan E. pa Lapidus, Asst. U. S. Atty., Chicago, for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and DOYLE, District Judge.[1]

JAMES E. DOYLE, District Judge.

The two defendants were found by a jury to be guilty of the transportation of illegal immigrants in violation of 8 U. S.C. § 1324. Each was sentenced to imprisonment and each appeals. Two issues are presented: (1) whether the trial court erred in denying a motion to suppress certain evidence; and (2) whether the trial court erred in the sentencing procedure.

### (1) *Suppression of evidence*

In denying defendants' motion to suppress, the trial court offered no explanation for the ruling and made no findings of fact with respect to it. However, the motion was directed to certain events which were testified to only by Meduga, a City of Chicago police officer. His testimony was not disputed, and it appears that the trial court accepted its accuracy. The facts related to the motion to suppress, as recited in this opinion, are taken entirely from the testimony of officer Meduga.

At about 10:00 a. m., February 17, 1969, Meduga and a fellow officer in a police car were proceeding northbound in the 8600 block of Buffalo Avenue, Chicago, which is an industrial area, when they came upon a truck parked in the street blocking their way. The truck bore Texas license plates. They waited for about two minutes to see whether the truck would be moved; it was not moved. The officers left their car and approached the parked truck. As they did so, two men (who later became the two defendants) came from a house up to the sidewalk. The police inquired whether the truck was theirs, and the men said it was. The police asked the two men to move the truck around the corner, which they did. Meduga's police partner proceeded to the right side of the cab of the truck. Meduga proceeded to the left side (the driver's side) of the cab of the truck. Meduga asked the driver for his driver's license, which was produced. Meduga observed at this time on the floor of the cab of the truck a dealer's cardboard license plate, bearing some lettering and the word "Texas." The police then asked the two men to get out of the cab of the truck, which they did. At this point, Meduga saw a machete on the floor of the cab of the truck. The police walked with the two men back to the police car. Their purpose was to check on the license plates.

Built on the back of the truck was a square, wooden, "house-type" box. It appeared to be a home-made box. It had windows. One of these windows was on the left side of the box, that is, the side of the box which corresponds to the driver's side of the cab of the truck. As Meduga was walking with one of the men from the driver's side of the cab of the truck back to the police car, he observed faces inside the truck looking at

---

1. District Judge Doyle of the Western District of Wisconsin is sitting by designation.

him. Meduga's police partner said to Meduga, "Did you see the faces in the truck?"

The officers placed the two men in the police car and returned to the box on the back of the truck and looked in. Meduga again saw the faces inside, looking out at the officers.

Meduga and his police partner called for their supervisor, a police sergeant, who came to the scene. The sergeant could speak Spanish.

Meduga was aware of the fact that there had been some unlawful immigration from Mexico into Texas. He had also heard numerous messages on the police radio from time to time giving descriptions of cars and trucks and people involved in transporting other people into the country illegally. He had heard no radio broadcast, police or otherwise, about these particular license plates, or this particular truck, or the two specific individuals who became the defendants in this case.

While the police officers spoke with the two men in the police car, the men said that they had just come from Texas and had just gotten into Chicago.

On the rear side of the box on the truck was a door with two latches. One latch had a bolt through it, and in the other a lock was hanging. Neither latch was locked.

After the events described above, Meduga, or his police partner in Meduga's presence, unbolted and opened the door. Several Mexican men were found inside the box. At the time the police opened the box, they had no arrest warrant and they had no search warrant.

The police took the two defendants and the men inside the box to the district police station, and then notified the United States Immigration and Naturalization Service.

At the trial the evidence consisted of the testimony of seven witnesses: an immigration officer, whose testimony was limited to the proposition that the Rio Grande river forms the international boundary line between Mexico and the southern edge of Texas; Maduga, whose testimony has been fully summarized in this opinion; and five Mexicans who had been found in the box of the truck. Each of the five Mexicans testified directly and extensively to facts which showed that each of the two defendants had indeed committed the immigration offense with which he was charged.

Clearly the testimony of the five Mexicans was essential to obtain the conviction and virtually assured conviction. Clearly, also, the witnesses were discovered as a result of the warrantless search of the truck.

Defendants contend that both the warrantless search of the truck-box, viewed independently, and the search as incident to the warrantless arrest of the defendants, were without probable cause and therefore violated the Fourth Amendment. They contend that the testimony of the five Mexicans found in the truck-box was the fruit of the poisonous tree and should have been suppressed.

The validity of the arrest of the defendants appears to be immaterial to the issues raised by the motion to suppress, unless the search is viewed as a search incident to the arrest of the defendants. It is not contended that any evidence—such as an admission or confession by one of the defendants, or such as an incriminating document seized in the course of a post-arrest search of the person of one of the defendants—was the fruit of the arrest. Because of the conclusion we reach with respect to the search of the truck-box, viewed independently of the arrest, it is unnecessary to consider further the validity of the arrest of the defendants or the validity of the search as incident to the arrest.[2]

We hold that there was probable cause for the search, viewed independently of the arrests, and that the prob-

2. The observation of the exterior of the truck and of the faces peering out of the windows of the truck-box was not incident to the arrest of the defendants.

able cause consisted of the combination of the following factors: the unusual appearance of a truck bearing an apparently home-made box, rather than more conventional cargo-carrying space; the observation on two occasions of human faces peering out of the windows of the box; the Texas license plates on the truck, and the extra Texas license plate on the floor of the cab of the truck; and the awareness on the part of officer Meduga that there had been reports on the Chicago police radio from time to time giving the description of vehicles, license plates, and persons believed to be involved in the illegal immigration of Mexicans.

The essence of defendants' contention appears to be that the search was prompted by constitutionally impermissible considerations: first, racial considerations prompted by the physical appearance of the defendants, and, second, disparaging attitudes toward the owners and operators of trucks with "home-made" cargo-carrying facilities. It was not established by the testimony of officer Meduga, or in any other way, that the officers were affected by the racial appearance of the defendants. If we were to assume, however, that the defendants appeared to the officers to be Mexican, and if we were to assume further that the officers were affected in some degree by this impression, when racial appearances of persons may be relevant to an objectice geographical setting (for example, the Mexico-Texas border), it is not impermissible to respond to these appearances in combination with other factors in determining probable cause. Similarly, when a police officer observes a "home-made" box on the back of a truck, egalitarian principles do not

render it constitutionally impermissible for him to respond to this stimulus, by attempting to relate it to a number of other factors operative in the situation.

Of all the interdependent factors in the situation, however, much the most persuasive was the police officer's observation of a number of faces peering from the inside of a "home-made" box on the back of a truck. It would be straining excessively the lessons of practical human experience to say that such a rare phenomenon, in the context of all the circumstances, did not provide probable cause for a search of the truck-box.

■■ Because of its mobility a motor vehicle may be made the object of a warrantless search under circumstances in which a search warrant might be required as a precondition to the search of a building. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The test for a warrantless search of a motor vehicle, which is vulnerable to prompt movement elsewhere without notice, is the test of probable cause. For the reasons stated, we believe that the probable cause test was satisfied in the circumstances of this search.[3]

### (2) Sentencing procedure

The jury returned its verdict of guilty and the court ordered a presentence investigation. A sentencing hearing was held. At the hearing, the court undertook to question one of the defendants persistently and aggressively concerning his possible connection with organized criminal activity in illegal immigration. At a certain point, counsel for this de-

3. Having reached this conclusion, we find it unnecessary to consider the government's further contention that even though it were to be assumed that it was an invalid search which uncovered the five Mexicans, the decision by these five persons to testify at the trial, and the testimony they then gave, involved the exercise of their will, perception, memory and volition, and that the exercise of these attributes of human

personality effected an attenuation dissipating any taint which marked the search. United States v. Hoffman, 385 F.2d 501, 504 (7th Cir. 1967). For the same reason, we find it unnecessary to rely upon 18 U.S.C. § 3502, and, therefore, unnecessary to consider questions of construction and constitutionality by the defendants with respect to the scope and operation of § 3502.

fendant objected, pointing out that the defendant had refrained from testifying at the trial and that he was entitled to the protection of the privilege against self-incrimination. Following this exchange, the court commented to counsel for the second defendant: "I assume you don't want me to interrogate your client about the receipt of any funds or what he did with them?," and counsel replied, "I would rather you not, your Honor." Thereafter, nevertheless, the court persisted to a degree. The court then made the following statement:

> "Well, you see, I have this problem in fixing sentence in this case: I would really like to know something more about these two defendants than I do know from this report. I would like to know more about them because it is apparent from the evidence that I heard in this case that this was not— it didn't sound like an isolated transaction, for one thing. It sounded like they knew exactly—they were rounding up some customers and they also apparently knew where they were going to go and they headed for Chicago. It was clear from the beginning where they were going to go.
>
> "It would make some difference to me if this was the first time that they had taken the road and tried this sort of thing or whether they were in the business."

Counsel for the defendants then requested leave to consult with their respective clients, and were granted leave. Each defendant then asserted, after the court had insisted that he be placed under oath, that he had never transported aliens over the border before. Whereupon, the court made the following statement:

> "Well, if they would like to sit down with the Immigration authorities and give the Immigration authorities the background of this case and who contacted them and how this whole thing came about and make a clean breast of of it, I may then think about what I am going to do but up until this point there has been no cooperation at all.

> They required us to go through a two or three day trial, or whatever this matter took, and on the face of it the trial was a ridiculous trial because they were obviously guilty of what they were charged with. There was no purpose in putting the Court or the jury to the time that was spent here in this case and if the Immigration Office or the prosecutor think that they can get some valuable information by a week's delay, I will give you a week's delay, but, if you think that that is useless, we will go ahead and sentence them today."

The United States Attorney responded that he would like the opportunity to pursue the court's suggestion. The court added:

> "If they can convince you that this was the first time that they had ever done this and that they had no one to help them—if they want to make a clean breast of it, they may, but if they don't want to talk, there is no purpose in spending five minutes with them."

In this setting, the sentencing hearing was continued. It was resumed six days later. Both counsel advised the court that the court's suggestion had been pursued but had not proven "fruitful." The court thereupon sentenced defendant Domingo Rodriguez-Macias to imprisonment for three years. Defendant Socorro Chaidez-Castro was sentenced to imprisonment on one count for three years, pursuant to 18 U.S.C. § 4208 (a) (2), and on each of the remaining four counts he was placed on probation for four years with the probationary period to commence with the end of the prison sentence. Each of these sentences was a lesser sentence than the statutory maximum.

Viewed most favorably to the defendants, the record of the first and second sentencing hearings might support the contention that the court's ultimate sentence was affected by: (a) the fact that the defendants had insisted upon a trial; and (b) the fact that both counsel indi-

cated at the opening of the second hearing that nothing had come of the court's strong intimation at the first hearing that the defendants should talk freely to the immigration officials during the interim. We express no opinion with respect to the wisdom of either of these propositions. We find, however, that the circumstances of this case fall far short of those present in United States v. Wiley, 278 F.2d 500, 503 (7th Cir. 1960), and that the circumstances presented here do not support the extraordinary relief involved in appellate intervention in the sentencing function.

For the reasons stated herein, the judgment of the district court is hereby affirmed.