**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Pascual GUANA-SANCHEZ, Defendant-
Appellee.**

**No. 72–1784.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1973.

Decided July 18, 1973.

Rehearing Denied Aug. 6, 1973.

James R. Thompson, U. S. Atty., William T. Huyck and Michael D. Stevenson, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellant.

Joseph Beeler, Federal Defender Program, Chicago, Ill., for defendant-appellee.

Before KILEY, FAIRCHILD and PELL, Circuit Judges.

KILEY, Circuit Judge.

Defendant, Sanchez, was charged in a one count indictment with knowingly and unlawfully transporting aliens within the United States in violation of 8 U. S.C. § 1324(a)(2). After an evidentiary hearing the district court granted Sanchez's motion to suppress evidence unlawfully seized by police. The government has appealed. We affirm.

On November 17, 1971, at approximately 2:30 a. m., Villa Park, Illinois, police officers Tenuto and Hall observed Sanchez sitting in a station wagon, about 150 to 200 feet away, in a vacant lot, with headlights and interior light shining. When the officers approached the car, Sanchez was in the driver's seat and was reading an Illinois road map. At this time the officers observed three other males also in the car, one of them sleeping, and three shopping bags filled with "clothing or material" in the rear of the car.

The officers then began an inquiry which disclosed that Sanchez had a valid driver's license, that his passengers were probably Mexican, and led to the further disclosure that the car was registered in Sanchez's name and that he was not "wanted by the police." The police then radioed for their supervising sergeant. Upon the sergeant's arrival and, at his direction, two of Sanchez's passengers were directed to enter a police car and were driven to a police station. Sanchez was "invited" to follow with the third passenger.

At the police station the sergeant spoke on the telephone with Captain Partin, a Chicago immigration official, who then spoke to Sanchez's passengers. Partin directed the police to detain Sanchez and his passengers, whom Partin told the police had admitted illegal entry into the United States. The four men were locked up overnight, were picked up by immigration authorities the next morning, and Sanchez was subsequently indicted. The proceeding before us followed.

Three steps in time can be delineated from the facts before us: (1) the original interrogation ending with the determination of validity of Sanchez's driver's license and his ownership of the car; (2) the period beginning with the return to Sanchez of his license and of the restraint upon his movement thereafter; and, (3) the period beginning with the trip to the police station.

The district judge conducted an evidentiary hearing at which the parties stipulated that no arrest or search warrant had issued. Officer Tenuto was the only government witness.[1] After the hearing, the district judge read his findings of fact and conclusions of law [2] in which he decided that the police officers had a reasonable suspicion justifying their interrogation, in the first step of the police activity, but that there was no probable cause to justify their activity thereafter.

When the sergeant appeared at Sanchez's car and appraised the situation, he said to officers Tenuto and Hall, "[l]et's bring them into the station and check them out and see who they are, if they are wanted by anybody." Two of the passengers were then ordered out of Sanchez's car and into a police car for the trip to the police station. Under the circumstances we take officer Tenuto's testimony that Sanchez was "invited" to follow to mean that he was ordered. Officer Tenuto testified that "[w]e did not have anything to bring them into the station for." The district judge properly noted that "Sanchez was taken into custody by the . . . officers for investigation . . . [and] [t]here is

---

1. The government stated that officer Hall's testimony would be substantially similar to Tenuto's.

2. The written memorandum from which he read is not in the record.

no crime of 'investigation.' " *See* Davis v. Mississippi, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); United States v. Foust, 461 F.2d 328, 330 (7th Cir. 1972). The police had no greater knowledge when they arrested Sanchez than they had after the end of the initial intrusion on reasonable suspicion. On the contrary, they had additional knowledge that he was most probably innocent of any connection with crime.[3] At best they had "hunches" of criminality but that is not sufficient. Terry v. Ohio, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1967).

■■■ There was no showing by the evidence ". . . that the exigencies of the situation" made the warrantless arrest "imperative." Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). The police had the burden of justifying the arrest. United States v. Burhannon, 388 F.2d 961, 962 (7th Cir. 1968). And the standards for warrantless arrests "are at least as stringent" as those applicable to a magistrate's assessment. Whiteley v. Warden, 401 U.S. 560, 566, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). This record falls far short of the required showing.

■■■ The warrantless arrest must be judged as of the time it was made. It could not be aided by the post facto developments of immigration official Partin's statement to the police that Sanchez's passengers were probably illegal entrants into the United States, nor by reason of the warrantless search of Sanchez's car which produced a hand gun in the glove compartment. *See* Henry v.

United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

The government's reliance upon this court's decision in United States v. Chaidez-Castro, 430 F.2d 766 (7th Cir. 1970), and United States v. Madril, 445 F.2d 827 (9th Cir. 1971), is misplaced. In *Chaidez-Castro* there were, in support of the warrantless arrest, Texas license plates on the truck and extra Texas license plates on the floor of the cab, and "the most persuasive [fact] was the police officer's observation of a number of faces peering from the inside of a 'home-made' box on the back of the truck." In *Madril* the court sustained the warrantless arrest, where the initial stop was occasioned by a speeding violation and thereafter the driver was unable to produce proof of ownership as required by law. Moreover, there was an outstanding warrant for defendant which was discovered during the course of checking the status of the vehicle and its occupants.

We have considered, but need not pass upon, other points raised.

■■■ We conclude that the district court did not err in deciding that the arrest was unreasonable under the Fourth Amendment and that the evidence gained thereafter was "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[4]

Affirmed.

PELL, Circuit Judge (dissenting).

Being of the opinion that the passengers, witnesses to a crime, should not have been suppressed as witnesses, *i. e.,*

---

3. When the arrest was made the police knew Sanchez owned the car and had a valid driver's license and they had no reason to believe that he was committing or was probably connected with an offense. The police had learned by observation before the arrest that Sanchez spoke, and his passengers responded in, a language the police "did not understand" but which was probably Spanish and that the passengers were probably Mexican or Puerto Rican. But the court properly noted that there is

no crime in speaking Spanish or being Mexican or Puerto Rican. *See* United States v. Mallides, 473 F.2d 859, 860 (9th Cir. 1973).

4. The government concedes that the testimony of witnesses discovered during an illegal search can be suppressed as to a person having standing to object. We think the same is true in the event of an illegal arrest. *See* United States v. Mallides, *supra,* 473 F.2d at p. 861.

in effect being made incompetent to testify to matters within their knowledge concerning criminal activity on the part of someone else, I respectfully dissent.

It is not entirely clear to me as to when the district court thought the illegal police activity commenced. The majority opinion of this court construes the district court opinion as holding that the police officers had a reasonable suspicion justifying the initial interrogation. I agree, and to the extent that the district court indicated otherwise it would seem clearly wrong. Four men were parked in a vacant lot in an industrial area at 2:30 in the morning in a Chicago suburb where recent burglaries had taken place. The defendant's story of looking for a friend's restaurant did not check out as all restaurants in the area had been closed for several hours. The officer who testified had had past experience with illegal immigrants who had been transported into this country by automobile. The area had small factories "looking for cheap labor." The passengers in the automobile spoke no English nor did they have any United States identification cards. One of the occupants had a card which appeared to be a Mexican Army card. Three shopping bags of clothing were in the car.

On the basis of these facts, I would have some difficulty in faulting the police conduct. See United States v. Catalano, 450 F.2d 985 (7th Cir. 1971). The police action was scarcely of the dragnet variety. However, this aspect of the case does not assume the significance that two other facets do.

The first of these is the extent to which the exclusionary rule should be extended. Putting the matter another way, how remote a branch of a poisoned tree is still capable of bearing tainted fruit not subject to the plucking for testimonial use? I am here, of course, assuming arguendo that the police conduct was such as to bring into play the exclu-

sionary rule as to any tangible item found in the automobile or any statement that might have been made by any of the persons in the automobile. Here, however, the effect of the district court ruling is to make witnesses to a crime incompetent to testify. "The rules which disqualify witnesses who have knowledge of relevant facts and mental capacity to convey that knowledge are serious obstacles to the ascertainment of truth. For a century the course of legal evolution has been in the direction of sweeping away these obstructions." McCormick on Evidence § 71, at 150 (1954).

A reversal of direction in this well developed trend of the law can obviously be dictated by policy considerations. I fail to find, however, such a countervailing policy here. I am not unmindful that respectable authority [1] has held that the exclusionary rule should be carried to the present position and that the Government has conceded that if a defendant has standing, testimony of witnesses discovered during an illegal search can be excluded. Nevertheless, the rationale of the exclusionary rule in my opinion does not call for its extension to the point of excluding altogether an otherwise competent witness. In so stating, I do not suggest that the *weight* of his testimony could not be challenged by showing the impact of the method of discovery on the likelihood of the witness's telling the truth, *e. g.*, if he were under compulsion to testify because of awareness that his own involvement in a crime was known by virtue of a Fourth Amendment violation.

We do not here have a *Wong Sun* [2] situation in which the excluded evidence, a verbal statement, is deemed to be equated with "physical, tangible materials obtained either during or as a direct result of an unlawful invasion." We here have witnesses who were in plain view of officers who, at the time, were

---

1. See, for example, Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965); United States v. Tane, 329 F.2d 848 (2d Cir. 1964).

2. Wong Sun v. United States, 371 U.S. 471, 484–486, 83 S.Ct. 407, 416, 9 L.Ed. 2d 441 (1963).

engaged in their "community caretaking functions." Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Essentially, it appears to me, we are dealing with a question of the extent to which the exclusionary rule might reasonably be expected to have a deterrent effect on proscribed police conduct. We know that the rule is not absolute, one to be applied in all circumstances. Thus, the Supreme Court in Harris v. New York, 401 U.S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971), held that a statement which was inadmissible against a defendant in the prosecution's case in chief because of a *Miranda* violation might be used for impeachment purposes. While we here have a proposed use of witnesses in the affirmative case of the prosecution, I cannot conceive that the rationale of deterrence of police misconduct will be furthered by this extension of the rule. The "speculative possibility that impermissible police conduct will be encouraged" (401 U. S. at 225, 91 S.Ct. at 645) by making witnesses competent in the present situation appears so remote to me that a sound public policy would draw the exclusionary situation short of a mandatory incompetency.

Indeed, in those cases holding that the witness himself may be the produce of the poisoned tree and therefore not free to testify as to his knowledge of the crime, the exclusion is not absolute and recognition has been given to what might be called an "attenuation test." Smith v. United States, *supra*, 344 F.2d at 547. I have some conceptual difficulty in determining how an exclusionary rule designed to control police behavior can be applied on a case-by-case basis as *Smith* would have us do. I am certain that police officers would have an even greater difficulty in determining whether a possible witness's testimony was attenuated from illegality.

While *Smith* did not purport to overrule an earlier case of the same circuit, Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), nevertheless, the earlier case in which the court spoke through then Judge Burger is worthy of extensive quotation as illustrating the concepts which I believe should be applicable in the present situation.

"Courts have gone a long way in suppressing evidence but no case as yet has held that a jury should be denied the testimony of an eyewitness to a crime because of the circumstances in which his existence and identity was learned. However, in our view, the relationship between the inadmissible confessions and Holman's testimony in the District Court months later is so attenuated that there is no rational basis for excluding it. No case has been cited to us in which the testimony of an eyewitness or factual witness has been excluded because his identity was discovered as a result of disclosures made by an accused during detention violative of Rule 5(a) Fed. R.Crim.P. . . .

"The District Judge correctly read this court's holding in Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241 (1962), as not requiring the exclusion of Holman's testimony. Neither the Killough holding, the Mallory holding nor any other case would warrant excluding Holman's testimony. The fact that the *source* of evidence is 'tainted' by violation of constitutional or statutory provisions has not precluded the use of that evidence in every circumstance. . . .

"Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions. But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, 'speak for themselves.' The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality

whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence." 324 F.2d at 881–882. (Footnotes omitted.)

It appears to me that in the intervening ten years the exclusionary rule has been expanded so as mechanically to equate the proffer of a living witness with the proffer of inanimate evidentiary objects illegally seized.

What appears to me to be a recession from the underlying principles announced in *Smith* and *Bowden* followed within less than a year in McLindon v. United States, 117 U.S.App.D.C. 283, 329 F.2d 238, 241 n.2 (1964), in which the court stated it did not read *Smith* and *Bowden* as holding that testimony may never be excluded. However, in so stating, reliance was placed on cases which forbade testimony as to visual and aural observations during an unlawful search. This, it appears to me, is no support for the present matter; obviously, if seized heroin is to be excluded, a witness who was present at the seizure should not be permitted to testify to the nature and identity of the seized material. The equation is clear and all that has to be justified is that the material itself is subject to suppression.

I note that the *McLindon* court did not mechanically equate the proffer of a witness whose knowledge was independent of the improper conduct with the proffer of illegally seized, inanimate evidentiary objects. Instead, in remanding for a hearing, it laid down a case-by-case standard as follows:

"In each case the court must determine how great a part the particular manifestation of 'individual human personality' played in the ultimate receipt of the testimony in question. Indications in the record that mere knowledge of the witness' identity would not inevitably guarantee that his testimony would be favorable to

the prosecution; that the witness might eventually have voluntarily gone to the police even without their knowing his identity; that his testimony has remained unchanged from the start—all are relevant factors to be considered in determining the final outcome." 329 F.2d at 241 n.2.

I find no consideration by the district court in the present case of any such factors. Rather, the rule was mechanically applied to exclude everything connected with the claimed improper conduct in a broad sweep of the broom which somehow is supposed to restrain undesirable constabulary conduct.

The rule as so expanded makes appropriate another quotation from *Smith* and *Bowden, supra,* 324 F.2d at 882:

"Mr. Justice Jackson would appear to have had something like this in mind when he expressed unwillingness to debase constitutional doctrine 'by making of them mere technical loopholes for the escape of the guilty. The petitioners have had fair trial and fair review. The people of the State are also entitled to due process of law.' Stein v. People of State of New York, 346 U.S. 156, 196, 73 S.Ct. 1077, 1098, 97 L.Ed. 1522 (1953)."

Of equal if not greater importance is the second significant facet of this case, that of standing. Of course, any indicted defendant is aggrieved by testimony which reflects on his guilt. Standing is something more than this human reaction. In *Tane,* the Second Circuit, which did apply the exclusionary rule to a witness, first considered the question of standing and determined that there was standing. In *Smith,* however, there seems to have been no consideration of the question. Whatever doubt there may have been as to the necessity of standing would seem to have been put to rest by the Supreme Court in Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969), where the Court stated:

"The established principle is that suppression of the product of a Fourth Amendment violation can be success-

fully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."

The passengers in defendant's automobile, all in plain view, were discovered initially during the course of what seems clearly to have been a valid investigatory stop. I cannot find any standing on the part of the defendant arising from the transportation of the passengers to the police station. *They* may have been aggrieved in a standing sense but it is not they who are attempting to assert a right of suppression. The fact that the passengers had been in the defendant's automobile should not, it appears to me, create some sort of vicarious standing. The defendant's transportation of the illegal immigrants should not be the basis of creating an immunity for him from harmful testimony. *Cf.* United States v. Chaidez-Castro, 430 F. 2d 766 (7th Cir. 1970). He had no proprietary interest in their bodies—or minds. I would vacate the order of suppression, reverse, and remand for a trial.