336 So.2d 132 (1976)
In the INTEREST OF R.L.J., a Child.
No. Z-475.
District Court of Appeal of Florida, First District.
July 19, 1976.
Rehearing Denied, September 1, 1976.
*133 Richard W. Ervin, III, Public Defender, and Michael J. Minerva, Asst. Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Andrew W. Lindsey, Asst. Atty. Gen., Tallahassee, for appellee.
*134 SMITH, Judge.
Wakulla County deputy sheriff Bailey asked appellant R.L.J.,[1] then 14 years old, to go to the sheriff's office for questioning. Bailey there gave the boy warnings required for custodial interrogation by Miranda v. Arizona,[2] elicited his confession to breaking and entering a dwelling with intent to commit a misdemeanor, and delivered him to an intake officer of the Division of Youth Services. R.L.J. was adjudicated a delinquent[3] and he now appeals, urging that evidence of his confession should have been suppressed. His lawyer asserts that deputy Bailey made "an unconstitutional arrest" and that neither Miranda warnings nor other intervening circumstances "sufficiently attenuated the taint" of the illegal arrest to "break, for Fourth [and Fourteenth] Amendment purposes, the causal connection between the illegality and the confession." Brown v. Illinois, 422 U.S. 590, 592, 603, 95 S.Ct. 2254, 2256, 2261, 45 L.Ed.2d 416, 420, 427 (1975);[4]Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). A parallel question arises under Section 12 of Florida's Declaration of Rights, which protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures... ."
Deputy Bailey had a well-founded suspicion, not amounting to probable cause for arrest, that appellant participated in recent burglaries. Bailey decided to question the youth and went to his home, where appellant's father told Bailey that appellant was with his brother-in-law, also a suspect. Bailey explained his wish to question appellant at the sheriff's office and, according to Bailey's testimony, appellant's father replied that he had no objection. Bailey drove to the brother-in-law's house and found appellant in the yard with his brother-in-law. When he asked appellant "if I might talk with him for a little while down at the sheriff's office," appellant inquired, "Why?" Bailey replied that "I would rather wait and go to the sheriff's office and I would explain it to him there." Appellant then "agreed to ride down to the sheriff's office with me in order for me to talk with him." Bailey did not advise the youth he was not obligated to go along for questioning. Appellant explained:
"Well, I figured that him a law officer, you had to, you now, I had to go with him."
At the sheriff's office Bailey read Miranda warnings to appellant from a card and after 30 to 40 minutes of questioning, obtained the confession which was received in evidence.

I.
Bailey made no arrest "in the technical and restricted sense" when he asked appellant to accompany him to headquarters for questioning. Melton v. State, 75 So.2d 291, 294 (Fla. 1954);[5]Range v. *135 State, 156 So.2d 534 (Fla.App.2d, 1963); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). But the absence of a formal arrest does not end the inquiry. The Fourth Amendment monitors arrests whether announced or unannounced, and it applies a rule of reason to both greater and lesser intrusions on protected privacy. Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968).[6] Thus, regardless of whether deputy Bailey thought he had "arrested" appellant, and in spite of his disclaimer,[7] any personal seizure unjustified by Fourth Amendment standards must be shown, under the rule of Wong Sun and Brown, not to have influenced the confession on which the State seeks to rely.
The threshold issue, then, is whether there was a personal seizure as defined in Terry, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879, 20 L.Ed.2d at 905:
"Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred."
The record shows that appellant moved progressively into a state of custody from the moment deputy Bailey asserted authority to request appellant's presence at headquarters without explanation. By increments appellant was thereafter "deprived of his freedom of action" in a "significant way." Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. He was 14 and a felony suspect. At first he tentatively challenged the requested interview by asking its purpose. When Bailey parried that inquiry, and so tacitly asserted his will and authority to proceed without explanation, the acquiescing youth was taken by patrol car for questioning at headquarters "in a police-dominated atmosphere." Miranda, 384 U.S. at 445, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.[8]
Considering appellant's youth, the deputy's methods and the purposeful formality of the headquarters visitation, we find that appellant's liberty was restrained to a degree cognizable under the Fourth Amendment. The deputy's Miranda warnings were themselves an acknowledgment  though assuredly not a conclusive one  that the imminent interrogation was custodial and therefore attended by guaranties of the Fifth Amendment, which "is in `intimate relation' with the fourth." Boyd v. United States, 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746, 752 (1886); Brown, 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 425. Appellant was in custody.

II.
Miranda warnings were given and there was no evidence that appellant's confession was coerced by physical deprivation, persistent interrogation or other constraints which the Fifth and Fourteenth Amendments have long been held to condemn. See Culombe v. Connecticut, infra n. 15. But this was no momentary on-scene intrusion of the sort which the Fourth Amendment accommodates for field investigation.[9] *136 Appellant's detention was more concentrated, lengthier and more purposeful than that, and his privacy interests were therefore more substantial than those of one who, though free to go, is stopped on the street for routine questioning.[10]
It is argued for appellant that a person under 18 cannot voluntarily submit to detention for interrogation in Florida because custodial interrogation without arrest is unauthorized by § 39.03(1), F.S., specifying occasions when a child "may be taken into custody." The cited statute provides that "[a] child may be taken into custody ... (b) [f]or a delinquent act, pursuant to the laws of arrest ... .", and in other circumstances not here pertinent.
We cannot agree that Florida's statutory enumeration of occasions for taking juveniles into custody forbids custodial questioning of juveniles in all events. Chapter 39 does not purport to govern all relationships between police and juveniles. Its principal concern, as its title indicates, is orderly and sensitive "judicial treatment" of juveniles. That phrase implies a concern for adjudicatory standards and for appropriate ancillary processes. Section 39.01(30) defines "taken into custody," the linchpin phrase of appellant's argument, as
"the status of a temporary physical control of a child by a person authorized by this chapter, pending his release, detention, or placement."
The statute refers to a child's "release" as his release "to a parent, a responsible adult relative, or an adult approved by the court"; to a child's "detention" as his delivery after parental notice "to the appropriate intake officer or ... detention home or shelter"; and to his "placement" as judicial release to an adult not a relative. Sec. 39.03(2), (3), F.S. We think the statute was not intended to forbid a brief and otherwise lawful investigative custody which is simply ended, without ceremony, when its legitimate purpose has been served. In these events formal "release, detention, or placement" is rarely "pending" or necessarily desirable. To read chapter 39 as prohibiting all custodial interrogation of nonarrested juveniles would encourage marginally valid arrests for investigative purposes,[11] deprive law enforcement authorities of a means to exonerate innocent suspects, and unduly deter apprehension of many felons.[12] We decline to give chapter 39, F.S., an effect so obviously unintended by the legislature. Accord, T.B. v. State, 306 So.2d 183 (Fla.App.2d, 1975).
We note In re A.J.A., 248 So.2d 690 (Fla. App.3d, 1971), which read § 39.03, F.S. 1971, as denouncing investigative delays after a child's arrest and before his presentation to *137 a magistrate.[13] Section 39.03(3), F.S. 1971, then provided:
"The person taking and retaining a child in custody shall notify the parents ... and shall, without delay for the purpose of investigation or any other purpose, deliver the child, by the most direct practicable route, to the court of the county or district where the child is taken into custody . .. ." 248 So.2d at 691 (emphasis added).
The Florida Supreme Court approved the District Court's decision "[i]n view of the explicit mandatory language" of the statute. Roberts v. State, 285 So.2d 385, 386 (Fla. 1973), quashing this Court's decision in State v. Roberts, 274 So.2d 262 (Fla.App.1st, 1973). But the 1973 Legislature revised § 39.03(3), F.S., and substituted a milder requirement that the child "taken into custody" be delivered to the intake officer "without unreasonable delay." Sec. 4, ch. 73-231, Fla.Laws; § 39.03(3)(a), F.S. 1975. It is evident the legislature thus removed statutory impediments to juvenile custodial interrogation which does not offend the United States and Florida Constitutions.

III.
No Florida statute having intervened to prevent appellant's headquarters interrogation, we must base our decision on whether appellant voluntarily submitted to the detention process.
We must first acknowledge that society often has strong interests in encouraging voluntary relinquishment of Fourth Amendment protections at police request. "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement"[14] and, as Mr. Justice Frankfurter said, close interrogation of criminal suspects "is often indispensable to crime detection" and a matter of "compelling necessity."[15] So, while one in custody may not be induced without warning to give incriminating answers, the Fourth Amendment permits police to propound questions to closely held suspects not only because the voluntary answers of the guilty may incriminate but also because voluntary answers by the innocent may exculpate: "The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned."[16]
Because of these considerations, the Fourth Amendment does not prevent voluntary submission to a search and does not require that a person be informed explicitly, in the manner prerequisite to waiver of Fifth Amendment rights, that he need not consent to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 243, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854, 872 (1973);[17]United States v. Watson, 423 U.S. 411, 424, *138 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976). In the same way, we think, the Fourth Amendment permits voluntary but uncautioned submissions to "seizures" of the order we consider here. An officer's spontaneous warning that the suspect need not go to headquarters for interrogation may conclusively demonstrate that the subsequent submission was voluntary, Clark v. State, 322 So.2d 635 (Fla.App.3d, 1975), but such a warning is not indispensable. The Supreme Court held in Watson that "the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance." 423 U.S. at 424, 96 S.Ct. at 828, 46 L.Ed.2d at 609.
Reviewing all aspects of deputy Bailey's diversion, detention and custodial interrogation of R.L.J., we must conclude that the boy's submission to it was the product of an overborne will and not the result of a "free and unconstrained choice."[18] It is not of controlling significance here that R.L.J. "figured that him a law officer, you had to ... go with him," and that Bailey said nothing to the contrary.[19] Yet that is a factor in the judgment, made weighty here because appellant was a suspect 14 years old[20] and, for all that appears, of no unusual maturity. Contrast Watson, 423 U.S. at 424, 96 S.Ct. at 828, 46 L.Ed.2d at 609. The decisive fact is that R.L.J. asked deputy Bailey the reason for the requested headquarters interrogation, and the deputy declined to say until they were at headquarters. He thereby overbore the youth's will, and postponed to a more advantageous moment R.L.J.'s decision on whether to acquiesce in the investigation. We hold that the State cannot constitutionally invite such a suspect to relinquish Fourth Amendment privacies,[21] withhold the information or explanation the suspect thinks necessary to his decision and then characterize as voluntary the resulting submission to authority.

IV.
There is no indication here that R.L.J.'s confession was not "induced by the continuing effects of unconstitutional custody." Brown, 422 U.S. at 597, 95 S.Ct. at 2258, 45 L.Ed.2d at 423. By Brown criteria, the "temporal proximity" of seizure and confession was immediate, the purpose of the seizure was fulfilled as Bailey intended, and no ameliorating circumstances isolated the detention from the confession,[22] as did Wong Sun's arraignment and release from custody. Wong Sun, 371 U.S. at 491, 83 S.Ct. at 419, 9 L.Ed.2d at 457. As in Brown, the unlawful detention here both in design and in execution, was investigatory. The confession was a direct and purposeful consequence of the detention. As in the case of James Wah Troy in Wong Sun and that of Brown himself, "there was no intervening event of significance whatsoever." Brown, 422 U.S. at 604, 95 S.Ct. at 2262, 46 *139 L.Ed.2d at 428. The confession was the effect of unconstitutional custody.
REVERSED.
MILLS, J., concurs.
BOYER, C.J., dissents.
BOYER, Chief Judge (dissenting).
After conversations with appellant's father, he was invited to the sheriff's office by the investigating officer. He asked "why" but then agreed to go. In my view, appellant was never "in custody". I therefore disagree that "appellant was in custody" and that his confession was "induced by the continuing effects of unconstitutional custody". I would affirm.
NOTES
[1] Section 39.14(4), F.S., requires for the protection of juvenile offenders that our decision and other records "refer to the child only by initials and court case number."
[2] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The conviction was unsupported by an explicit trial court finding that appellant's confession was voluntary. Our disposition of the case makes unnecessary the usual remand for a finding on that issue. Husk v. State, 305 So.2d 19 (Fla.App. 1st, 1974).
[4] "The Miranda warnings are an important factor ... in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant." 422 U.S. at 603-04, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427 (footnotes omitted).
[5] "When used in this sense, an arrest involves the following elements: (1) A purpose or intention to effect an arrest under a real or pretended authority; (2) An actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested; (3) A communication by the arresting officer to the person whose arrest is sought, of an intention or purpose then and there to effect an arrest; and (4) An understanding by the person whose arrest is sought that it is the intention of the arresting officer then and there to arrest and detain him. Cornelius, Search and Seizure, 2nd ed., Sec. 47; 6 C.J.S., Arrest, § 1."
[6] "It is quite plain that the Fourth Amendment governs `seizures' of the person which do not eventuate in ... `arrest' in traditional terminology."
[7] Taylor v. Arizona, 471 F.2d 848, 851 (9th Cir.1972), cert. den. 409 U.S. 1130, 93 S.Ct. 948, 35 L.Ed.2d 262 (1973). See also Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 139 (1959); Davis v. Mississippi, 394 U.S. 721, 726-27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676, 681 (1969).
[8] Contrast Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), in which Mr. Justice White criticized the majority's finding that Orozco was "in custody" in his own bedroom: "It is difficult to imagine the police duplicating in a person's home or on the street those conditions and practices which the Court found prevalent in the station house and which were thought so threatening to the right to silence." 394 U.S. at 329-30, 89 S.Ct. at 1098, 22 L.Ed.2d at 316.
[9] See Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The Court in Miranda took care not to affect by its decision "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process... ." "It is an act of responsible citizenship", the Court stated, "for individuals to give whatever information they may have to aid in law enforcement." 384 U.S. at 477-78, 86 S.Ct. at 1629-30, 16 L.Ed.2d at 725-26. See also LaFave, Arrest  The Decision to Take a Suspect into Custody 344-47 (1965).
[10] "Where a police officer interrogates a citizen and restricts his liberty for the moment, if the individual is aware that he is free to leave, there is no arrest effectuated... . In applying the `free to go' rule it is quite possible that an arresting officer may overtly conduct himself in an aggressive manner with all the indications of detaining a suspect, but may indulge in expressions to the contrary. Where a police officer has testified ... that he had no intention of arresting the accused, his actions may sufficiently indicate otherwise." 1 Varon, Searches, Seizures and Immunities 113 (2d ed. 1974) (footnotes omitted).
[11] "If ... the police are able to get no answers from suspects, innocent or guilty, without arresting them, then a great many more innocent men will be making unnecessary trips to the station house. Ultimately it may be necessary to arrest a man, bring him to the police station and provide a lawyer, just to discover his name. Even if the man is innocent the process will be an unpleasant one." Mr. Justice White dissenting in Orozco, 394 U.S. at 331, 89 S.Ct. at 1099, 22 L.Ed.2d at 317.
[12] In 1975 persons under 18 were charged with 39.6 percent of Florida burglaries, 34.8 percent of larcenies and 29.6 percent of motor vehicle thefts. State of Florida Department of Criminal Law Enforcement, 1975 Annual Report at 35 (1976).
[13] "The legislative enactment embodied in the cited section clearly expresses a policy of the State of Florida. It is a legislative directive to the courts and other law enforcement agencies that juveniles shall be treated differently from other suspected criminals in that they shall not be taken to a police station or jail for interrogation. The purpose of this directive is that a juvenile, presumptively inexperienced in the ways of crime, should not be subjected to the intimidating influences of an adult police station or jail. Even if this directive is based upon an inaccurate premise in some instances, it is nevertheless within the province of the legislature." 248 So.2d at 692.
[14] Miranda, 384 U.S. at 477-78, 86 S.Ct. at 1629-30, 16 L.Ed.2d at 725-26.
[15] Culombe v. Connecticut, 367 U.S. 568, 571, 81 S.Ct. 1860, 1862, 6 L.Ed.2d 1037, 1040 (1961). The interrogation in Culombe began in a way somewhat similar to that in this case. Officers called on the suspects at their homes and advised each that "Lieutenant Rome wanted to talk with him at State Police Headquarters. They said that this was not an arrest." 367 U.S. at 607, 81 S.Ct. at 1882, 6 L.Ed.2d at 1060. The wearying interrogation that followed was held to have extorted involuntary admissions of guilt in violation of due process.
[16] Culombe, 367 U.S. at 571, 81 S.Ct. at 1862, 6 L.Ed.2d at 1040.
[17] "[T]he community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense."
[18] Schneckloth, 412 U.S. at 225, 93 S.Ct. at 2047, 36 L.Ed.2d at 862; Watson, 423 U.S. at 424, 96 S.Ct. at 828, 46 L.Ed.2d at 609.
[19] Chief Justice Burger, then Circuit Judge in the District of Columbia Circuit, wrote in Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158, 161 (1967), that "an assumption that one is required to cooperate with the police can hardly be equated with an arrest... ." The court there held that the station interrogation was not custodial.
[20] Judge Burger's opinion for the court in Hicks distinguished that court's decision in Seals v. United States, 117 U.S.App.D.C. 79, 325 F.2d 1006 (1963), cert. den. 376 U.S. 964, 84 S.Ct. 1123, 11 L.Ed.2d 982 (1964), finding an unlawful arrest, because Seals was "an acknowledged suspect" and a "high school student." 382 F.2d at 162. Earlier, the Supreme Court could not conceive "that a lad of tender years is a match for the police in such a contest." Haley v. Ohio, 332 U.S. 596, 599-600, 68 S.Ct. 302, 304, 92 L.Ed. 224, 228 (1947).
[21] An "invitation" to come to the station may mean, in certain circumstances, an order to come. United States v. Guana-Sanchez, 484 F.2d 590, 591 (7th Cir.1973), cert. dism. 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361 (1975).
[22] 422 U.S. at 601-05, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427.