

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 JUL -8  AM 9: 02

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68241-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRYAN DORSEY, | ) | UNPUBLISHED OPINION |
| a/k/a BRIAN DORSEY, | ) | |
| | ) | FILED:  July 8, 2013 |
| Appellant. | ) | |

VERELLEN, J. — Bryan Dorsey appeals his conviction for first degree robbery and his sentence under Washington's Persistent Offender Accountability Act (POAA), RCW 9.94A.570.  He argues that the trial court erroneously admitted evidence and that prosecutorial misconduct occurred in closing argument.  He contends that his sentence must be reversed because his prior Arkansas convictions are not comparable to Washington "strike" offenses, and the application of the POAA violated his rights to a jury trial and to equal protection.  He asserts that the court erred in ordering him to provide his fingerprints at sentencing, by allowing expert testimony identifying his fingerprints on documents, and by concluding that he was on community custody at the time of the robbery.  Finally, he contends that the trial court erred by imposing a term of community custody.  We affirm.

FACTS

In February 2009, Javonna Williams, Zaria Thomas, and Bryan Dorsey went to the residence of Victor Curtis and Deloris Major. Williams, Thomas, and Dorsey claimed that Major's great-grandson had stolen a television belonging to Williams. Dorsey pointed a pistol at Curtis and demanded that somebody pay for the television. Major told Dorsey she kept money upstairs. Dorsey took her upstairs and Major gave Dorsey $2,000 in cash. Williams, Thomas, and Dorsey left the home and fled in a car driven by Ron Watkins.

Three days later, police stopped the car in California. Dorsey, Williams, and Watkins were inside. Dorsey told the officers that he and Williams left Washington a day or two earlier. The officers found a pistol in the waistband of Dorsey's pants, which he admitted owning. Because he was a felon, precluded from possessing a gun, Dorsey was arrested and the gun was confiscated.

During the investigation of the robbery, Curtis identified Williams and Thomas from photomontages, and Major identified Thomas. Williams and Thomas were then charged for the robbery.

In December 2010, Williams informed police that Dorsey was involved in the robbery.[1] Williams pleaded guilty, and agreed that she would testify against Dorsey. Dorsey was charged with first degree robbery with a firearm sentencing enhancement.

At Dorsey's trial, Williams testified that she was friends with Dorsey, that he went by the nickname Gemini, and that when she, Thomas, and Dorsey arrived at Major's

---

[1] Major and Curtis were unable to identify Dorsey from montages containing Dorsey's photograph.

2

house, Dorsey became angry and brandished what "looked like" a gun.[2] She testified that Dorsey displayed a large amount of cash once in the getaway car. She confirmed that she was with Dorsey when they were contacted by police officers in California, and the officers confiscated Dorsey's pistol.

Thomas also testified to Dorsey's involvement in the robbery. Transcripts and recordings of jail phone conversations between Dorsey and Thomas were admitted as evidence of his guilt. In these calls, Thomas and Dorsey discussed both the robbery and Williams' agreement to testify against Dorsey.

Watkins testified at trial that he was with Williams, Thomas, and Dorsey on the night of the robbery and drove the getaway car. His recollection was limited, but he recalled that Dorsey displayed cash in the car after the robbery and gave him $50.

Major and Curtis testified about the details of the robbery. Both identified the handgun recovered from Dorsey in California as the gun used in the robbery.

The jury found Dorsey guilty as charged. As a persistent offender, he was sentenced to a mandatory term of imprisonment for life.

DISCUSSION

*Thomas's Prior Statements*

Dorsey contends that a single statement by Zaria Thomas at trial was hearsay, and was so prejudicial that his conviction should be reversed. We disagree.

In pleading guilty for her role in the robbery, Thomas agreed to testify against Dorsey. When Thomas testified at trial, she initially attempted to exculpate Dorsey. She later explained that she was afraid to testify against him. During her initial trial

---

[2] Report of Proceedings (RP) (Oct. 12, 2011) at 573.

3

testimony, Thomas said that she knew two men called Gemini, one of whom was Dorsey. She claimed the other Gemini, not Dorsey, committed the robbery.[3] She claimed that the other Gemini was dropped off after the robbery, and that Williams and Watkins then picked up Dorsey and drove to California.

The prosecutor confronted Thomas with her prior statements. In one, she had told a detective that the Gemini who committed the robbery was named Bryan. Dorsey's first name is Bryan. Thomas read aloud a prior description she gave of the Gemini who had committed the robbery, stating, "[H]e's about five-seven; he's dark-skinned; he has [a hairstyle known as] waves; he has a thing for snakes; he does voodoo."[4]

Dorsey's counsel objected that Thomas's statement was not based on personal knowledge, but on hearsay information she learned from Williams. Generally, a witness may testify only concerning facts of which the witness has personal knowledge.[5] The trial court has broad discretion when evaluating a witness's personal knowledge, and "such testimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge."[6]

---

[3] Thomas described the other Gemini as a "buff" 6'2" to 6'3" black man with a "fade" haircut, who had dated Javonna Williams. RP (Oct. 13, 2011) at 709. Dorsey is 5'7" and 132 lbs, and was not seen with a "fade."

[4] RP (Oct. 13, 2011) at 717-18.

[5] ER 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The burden of establishing such a foundation "is upon the proponent of the testimony." State v. Vaughn, 101 Wn.2d 604, 611, 682 P.2d 878 (1984).

[6] Vaughn, 101 Wn.2d at 611.

4

Dorsey fails to demonstrate that the trial court abused its discretion by concluding there was sufficient evidence that Thomas had firsthand knowledge of the facts to which she testified. The record demonstrates that Thomas made the statements in an interview with a detective on June 2, 2009, only three months after the robbery. In that interview, she stated that she knew Dorsey, referred to him as Gemini, and described his physical characteristics and his interests. This evidence supports a reasonable conclusion that Thomas had firsthand knowledge of the subject matter of her testimony.

Moreover, we reject Dorsey's argument that Thomas's statements were inadmissible hearsay. The admission of evidence lies within the sound discretion of the trial court.[7] Discretion is abused when it is exercised on untenable grounds or for untenable reasons.[8] A prior out-of-court statement by a testifying witness offered for a purpose other than to prove the truth of the statement is not hearsay.[9] Here, the purpose of the prior inconsistent statements was to contrast Thomas's earlier statements with her initial exculpatory testimony, to provide the jury a basis in fact to evaluate the veracity of her testimony.[10] The prior inconsistent statements were not offered to prove the truth of the matters asserted, and were not hearsay.

---

[7] State v. Norlin, 134 Wn.2d 570, 576, 951 P.2d 1131 (1998).

[8] State v. Robtoy, 98 Wn.2d 30, 42, 653 P.2d 284 (1992); State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

[9] ER 801 defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Parris, 98 Wn.2d 140, 145, 654 P.2d 77 (1982) ("It is only when the out-of-court statement is offered for the truth of its content that . . . problems arise.").

[10] A witness may be impeached as to their credibility by a prior inconsistent statement. State v. Classen, 143 Wn. App. 45, 59, 176 P.3d 582 (2008).

Dorsey also claims that Thomas's statement about voodoo was unfairly prejudicial. Dorsey's counsel asked the trial court, "Can we keep the voodoo crap out?"[11] This was not a sufficient objection to preserve this issue for appeal. "An objection which does not specify the particular ground upon which it is based is insufficient to preserve the question for appellate review."[12] And regarding the reference to snakes, Dorsey waived any argument on the issue by failing to raise it in the trial court. Moreover, it is highly unlikely that Thomas's remarks about snakes affected the outcome of the trial.

Dorsey fails to show an abuse of the trial court's discretion in allowing the jury to consider Thomas's prior inconsistent statements.

*Jail Phone Calls*

Dorsey asserts that the trial court erred by admitting redacted recordings and transcripts of three phone calls by Dorsey from jail to Thomas and her boyfriend. In the calls, Dorsey identified himself as Gemini, said that Watkins and Williams had turned against him, and claimed he was satisfied with how Thomas was responding to the investigation.

Dorsey contends that the use of this evidence violated his right to privacy under article I, section 7 of the Washington Constitution. Although Dorsey objected to the admission of the recordings and transcripts at trial, he did so on different grounds.[13]

---

[11] RP (Oct. 13, 2011) at 719.

[12] State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985); see also ER 103(a)(1) (requiring counsel to state the specific ground for the objection).

[13] At trial, Dorsey argued that the court should exclude the evidence because (1) "there is not a witness with personal knowledge of the conversations that can authenticate the recordings"; (2) "there is not sufficient independent proof to prima facie

A reviewing court will not consider an issue raised for the first time on appeal unless the issue constitutes a manifest error affecting a constitutional right.[14] To establish that the error was manifest, a defendant must make a plausible showing that the error had a practical and identifiable consequence in the trial of his case.[15]

Dorsey fails to demonstrate a manifest error. There is ample authority that jail phone calls are not private, and a jail inmate has no reasonable expectation of privacy in the recorded conversations.[16] Moreover, Dorsey provides no citations to the record to support his contentions that the State obtained the recordings without a search warrant or based upon any individualized suspicion, and that the recordings were not made in an effort to ensure jail security.

Dorsey has not demonstrated that he is entitled to appellate relief as a result of the State's use of the recordings and transcripts of his jail phone calls.

### Handgun

In Dorsey's statement of additional grounds for review, he contends the handgun introduced at trial was not relevant. But Dorsey cites no authority, and fails to identify any portion of the record supporting his argument. To the contrary, the record reveals that Curtis and Major testified that Dorsey used the handgun, exhibit 12, in the robbery,

---

establish the corpus delicti of the charged crime"; and (3) "the overwhelming prejudicial value of the content substantially outweighs the probative value of the recordings." Clerk's Papers at 105.

[14] RAP 2.5(a); State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

[15] State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

[16] State v. Modica, 164 Wn.2d 83, 88, 186 P.3d 1062 (2008); State v. Archie, 148 Wn. App. 198, 203, 199 P.3d 1005 (2009); State v. Haq, 166 Wn. App. 221, 256-58, 268 P.3d 997, review denied, 174 Wn.2d 1004 (2012).

and California Highway Patrol Officer Ernesto Coronel testified that exhibit 12 was the same gun he found on Dorsey's person. There was no error.

### Prosecutor's Argument

Although he did not object at trial, Dorsey contends that the prosecutor's closing argument was misconduct and that no curative instruction could have remedied the resulting prejudice. Dorsey's argument is not persuasive.

The prosecutor first argued:

> Now, we've got a cast of characters and we're going to spend some time talking about that. And they're not perfect, not by a long shot.
>
> But what is this process about? What are we here to achieve? What is the search that occurs in this courtroom, and every courtroom in this building? And that's a search for the truth. What happened that day and who was involved.[17]

Immediately thereafter, the prosecutor referred to the correct standard:

> Now, you've got [jury instruction 14,] the 'to convict' instruction. That outlines each and every element of what the State needs to prove beyond a reasonable doubt . . . . The elements of robbery in the first degree is what the State needs to prove beyond a reasonable doubt.[18]

The prosecutor concluded his initial closing argument by reemphasizing the State's burden of proof and the jury's role of determining the credibility of witnesses:

> The State has a high burden and we should. . . . If you believe these people, if you believe them beyond a reasonable doubt, Mr. Dorsey's guilty.[19]

---

[17] RP (Oct. 18, 2011) at 962.

[18] Id. at 962-63.

[19] Id. at 975.

In closing, defense counsel argued that Dorsey was set up and the witnesses against him were lying: "The facts of this case reveal that this pack of liars has set Mr. Dorsey up."[20] Counsel added:

> [I]f you believe that somebody has said something under oath falsely once, you can disregard that testimony. They're unreliable. They're liars. How do you know what is the truth if you know they've lied once?[21]

Counsel argued that Williams would "say anything in any circumstance to benefit her."[22] He repeated this allegation in regards to Thomas.

The prosecutor argued in rebuttal, That's what this whole thing is about, what's the truth? Was he there?"[23] "What is the truth? . . . The truth is what the State can prove."[24] He then continued:

> What is the truth? How do we find the truth? Like anything, we gather the people that were together at the time and we find out what the truth is. And the truth of the matter, ladies and gentlemen, is that on February 28th, 2009, the defendant was over at that house. And if you find that he's at the house, then he's guilty of robbery in the first degree.[25]

The prosecutor concluded by referring to the proper burden of proof: "[W]e've met our burden beyond a reasonable doubt. We're asking you to find the defendant guilty as charged."[26]

---

[20] Id. at 976.

[21] Id. at 983.

[22] Id.

[23] Id. at 987.

[24] Id. at 988.

[25] Id. at 991.

[26] Id.

The prosecutor's remarks concerning "truth" were not misconduct. The prosecutor repeatedly referred to the correct beyond a reasonable doubt burden of proof. In context, the prosecutor was emphasizing the jury's role in determining the witnesses' credibility. The remarks in rebuttal were made in response to the defense argument. Even otherwise improper remarks in rebuttal are not grounds for reversal if provoked by defense counsel or made in reply to defense arguments, unless the remarks are so prejudicial that a curative instruction would be ineffective.[27]

The remarks at issue here are readily distinguishable from the misconduct in the cases Dorsey relies upon, State v. Berube,[28] State v. Anderson[29] and State v. Emery.[30] In Berube, the prosecutor mischaracterized the burden of proof by contrasting the "search for truth" and the reasonable doubt standard:

> The word verdict means to speak the truth. And I ask that you search for the truth. When you go back into that jury room, you search for the truth, not a search for reasonable doubt. And I ask that you find him guilty.[31]

In Anderson, the prosecutor made repeated requests for the jury to "declare the truth," and to return "not just a verdict, but a just verdict."[32] The Anderson court

---

[27] State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

[28] 171 Wn. App. 103, 286 P.3d 402 (2012).

[29] 153 Wn. App. 417, 220 P.3d 1273 (2009).

[30] 174 Wn.2d 741, 278 P.3d 653 (2012).

[31] Berube, 171 Wn. App. at 120. Despite finding the remarks improper, the court concluded that because Berube did not object and the impropriety was "easily curable, especially in light of the court's instructions," any error was waived. Id. at 121.

[32] Anderson, 153 Wn. App. at 423-24.

concluded that although the argument was improper, the defendant failed to demonstrate a substantial likelihood that the misconduct affected the verdict.[33]

The Emery court determined that a prosecutor engaged in misconduct by arguing that the jury should "speak the truth by holding these men accountable for what they did,"[34] in light of the prosecutor's earlier argument mischaracterizing the beyond a reasonable doubt standard.[35] Nevertheless, the court found that the failure to object at trial was fatal:

> If either Emery or Olson had objected at trial, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden. Such an instruction would have eliminated any possible confusion and cured any potential prejudice stemming from the prosecutor's improper remarks. Emery's and Olson's claim necessarily fails and our analysis need go no further.[36]

Significantly, as was true in Emery, and Anderson, Dorsey did not object at trial to the remarks, nor did he request a curative instruction. Dorsey fails to demonstrate that a curative instruction could not have remedied any potential prejudice. The jury was correctly instructed on the State's burden of proof. Jurors are presumed to follow the court's instructions.[37]

Accordingly, he waived the issue.

---

[33] Id. at 429.

[34] Emery, 174 Wn.2d at 751.

[35] The prosecutor had argued that "in order for you to find the defendant not guilty, you have to ask yourselves or you'd have to say, quote, I doubt the defendant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank." Id. at 750-51.

[36] Id. at 764.

[37] State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008); State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

*Fair Trial*

Dorsey argues that cumulative error deprived him of a fair trial.[38] But his failure to prove any trial court error, much less multiple errors and resulting substantial prejudice, prevents him from prevailing under the cumulative error doctrine.

*Comparability of Prior Arkansas Convictions*

Dorsey contends the trial court erred in concluding that his two prior Arkansas aggravated robbery convictions were comparable to Washington strike offenses for purposes of his sentencing as a persistent offender. We disagree.

A "persistent offender" is an offender who has been convicted in Washington of a most serious offense and has on at least two other prior occasions been convicted of a most serious offense in this or any other state.[39] When a defendant's criminal history includes an out-of-state conviction, the Sentencing Reform Act requires that the conviction be classified according to a comparable Washington offense.[40] The State is required to prove the existence and classification of any out-of-state conviction by a preponderance of the evidence.[41]

The sentencing court compares the elements of the out-of-state offense with the elements of the comparable Washington statute.[42] If the elements are comparable as a matter of law, or if the foreign jurisdiction defines the crime more narrowly than

---

[38] Where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effects of the errors denied the defendant a fair trial. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984).

[39] RCW 9.94A.030(37).

[40] RCW 9.94A.525(3); State v. Ford, 137 Wn.2d 472, 483, 973 P.2d 452 (1999).

[41] State v. McCorkle, 137 Wn.2d 490, 495, 973 P.2d 461 (1999).

[42] State v. Morley, 134 Wn.2d 588, 606, 952 P.2d 167 (1998).

Washington, the out-of-state conviction counts towards the defendant's offender score.[43]

As relevant here, a "most serious offense" is defined to include both robbery in the second degree and felony "attempt" to commit robbery in the second degree.[44] Washington law provides that a person commits robbery in the second degree "if he or she commits robbery."[45] "Robbery" is defined as follows:

> A person commits robbery when he or she unlawfully *takes personal property* from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.[46]

A person is guilty of an attempt to commit a felony offense "if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime."[47]

Dorsey argues, and the State concedes, that the relevant Arkansas statute is broader than Washington's robbery statute because it does not require the actual taking of property.[48]

---

[43] Ford, 137 Wn.2d at 479-80.

[44] RCW 9.94A.030(32).

[45] RCW 9A.56.210.

[46] RCW 9A.56.190 (emphasis added).

[47] RCW 9A.28.020(1).

[48] The Arkansas aggravated robbery statute provides, "A person commits aggravated robbery if he or she commits robbery as defined in § 5-12-102, and the

The State argues that the Arkansas offense is comparable to the Washington strike offense of attempted second degree robbery. At oral argument before this court, Dorsey acknowledged that, even if the charging document in the Arkansas conviction is ambiguous as to whether he took property, it reveals that the offense is comparable to a felony attempt to commit second degree robbery under Washington law. We agree. Attempted second degree robbery under Washington law does not require actual taking of property and is legally comparable to aggravated robbery under Arkansas law.[49]

We affirm the persistent offender sentence.

*Rights to a Jury Trial and to Due Process of Law*

Dorsey argues that the persistent offender statute violates his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to proof beyond a reasonable doubt of the two prior strike offenses that increased his maximum sentence. But Dorsey's argument is inconsistent with controlling authority.

In <u>Almendarez-Torres v. United States</u>, the United States Supreme Court rejected the argument that recidivist factors need to be charged in an indictment, proven to a jury, or proven beyond a reasonable doubt.[50] Subsequent to <u>Almendarez-Torres</u>,

---

person: (1) Is armed with a deadly weapon; (2) Represents by word or conduct that he or she is armed with a deadly weapon; or (3) Inflicts or attempts to inflict death or serious physical injury upon another person." AC.A § 5-12-103.

"Robbery" is further defined by statute as, "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person." A.C.A. § 5-12-102.

[49] Because the Arkansas conviction is legally comparable to a Washington strike offense, we need not consider factual comparability.

[50] 523 U.S. 224, 239, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998).

the court held that factual matters relating to the charged crime that enhance a sentence must be proved to a jury, but reaffirmed that a jury need not otherwise determine the fact of a defendant's prior conviction.[51]

Consistent with the United States Supreme Court, our Supreme Court has repeatedly rejected the argument that a jury must determine the existence of prior convictions.[52] In State v. Smith, our Supreme Court confirmed that prior convictions need not be proved to a jury in order to establish that a defendant is a persistent offender.[53]

Dorsey fails to distinguish Almendarez-Torres and Smith. Those decisions preclude relief to Dorsey on this issue.

Dorsey also contends that the POAA violates the equal protection clause of the Fourteenth Amendment and article I, section 12 of the Washington Constitution. He argues that since proof of a prior conviction as an element of a crime must be proved to a jury, a jury must also determine whether a prior conviction is a "most serious offense" for purposes of persistent offender sentence. This argument has been repeatedly rejected.[54]

---

[51] Apprendi v. New Jersey, 530 U.S. 466, 489-90, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[52] State v. Salinas, 169 Wn. App. 210, 225-26, 279 P.3d 917 (2012) (citing State v. Thiefault, 160 Wn.2d 409, 418,158 P.3d 580 (2007)), review denied, 176 Wn.2d 1002 (2013).

[53] 150 Wn.2d 135, 141-43, 75 P.3d 934 (2003).

[54] See Salinas, 169 Wn. App. at 225-26 (rejecting same argument); State v. Reyes–Brooks, 165 Wn. App. 193, 206-07, 267 P.3d 465 (2011); State v. Langstead, 155 Wn. App. 448, 453-58, 228 P.3d 799 (2010); State v. Williams, 156 Wn. App. 482, 496-98, 234 P.3d 1174 (2010).

15

Recidivist criminals are not a semi-suspect class and the proper test to apply is the rational basis test, "the most relaxed and tolerant form of judicial scrutiny under the equal protection clause."[55] Under the rational basis test, the legislative classification will be upheld unless it rests on grounds wholly irrelevant to achievement of legitimate state objectives.[56]

The purpose of the POAA is to improve public safety by imprisoning the most serious recidivist offenders, a purpose that our Supreme Court has held is a legitimate state objective.[57] The POAA is the legislature's appropriate "attempt to define a particular group of recidivists who pose a significant threat to the legitimate state goal of public safety."[58] This legislative objective is a sufficient basis for upholding the POAA's classification and treatment of persistent criminals.

*Community Custody Status at Time of Offense*

In calculating Dorsey's offender score, a point was added based on the fact that he was on community custody.[59] Dorsey contends that no evidence showed that he was on community custody at the time of his current offense.

However, according to the sentencing brief Dorsey submitted to the trial court, he agreed he was on community custody when he committed the current offense. In his briefing to the trial court, Dorsey argued only that three prior convictions should be

---

[55] State v. Shawn P., 122 Wn.2d 553, 561, 859 P.2d 1220 (1993).

[56] Williams, 156 Wn. App. at 496-98.

[57] State v. Manussier, 129 Wn.2d 652, 674, 921 P.2d 743 (1996).

[58] Id.

[59] If a present conviction is for an offense committed while the offender was under community custody, one point is added to the offender score. RCW 9.94A.525(19).

excluded. Because Dorsey did not dispute that he was on community custody, he is barred from raising this claim for the first time on appeal.[60]

### Order Requiring Dorsey's Fingerprints

On October 28, 2011, after the jury returned its guilty verdict, the trial court ordered the taking of Dorsey's fingerprints pursuant to CrR 4.7.[61] Dorsey made a perfunctory objection. On appeal, Dorsey contends that his constitutional right to privacy was violated when the fingerprints were taken without a warrant.[62]

In this context, article I, section 7 of the Washington Constitution requires a two-part analysis. First, the court determines whether the action constitutes a disturbance of one's private affairs.[63] If not, no article I, section 7 violation exists. If a valid privacy interest has been disturbed, the second step is an inquiry whether authority of law justifies the intrusion.[64] In State v. Surge, our Supreme Court explained that "[i]t is a well established practice of government to collect fingerprints from convicted felons for identification purposes,"[65] and "[t]he constitutionality of fingerprinting convicted persons is unquestioned."[66] Similarly, federal courts have concluded that, under the United

---

[60] RAP 2.5(a).

[61] Specifically, CrR 4.7 (b)(2)(iii) provides that "[n]otwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, the court on motion of the prosecuting attorney or the defendant, may require or allow the defendant to . . . be fingerprinted."

[62] Article I, section 7 reads, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

[63] State v. Surge, 160 Wn.2d 65, 71, 156 P.3d 208 (2007).

[64] Id.

[65] 160 Wn.2d 66, 74, 156 P.3d 208 (2007).

[66] Id. at 78.

States Constitution, fingerprinting a person held in lawful custody does not violate that person's privacy rights.[67]

As was true in Surge, in this case, the private affairs inquiry focuses on a convicted felon's asserted privacy interest in his or her identity, not on the privacy interests of the ordinary citizen.[68] At the time Dorsey's fingerprints were taken, he had already been convicted and was in lawful custody. Under RCW 10.64.025, there is a presumption that a defendant who has been found guilty of a felony and is awaiting sentencing "shall be detained." After his conviction, Dorsey was no longer the beneficiary of the presumption of innocence, and had a substantially reduced expectation of privacy.[69] Given these facts, there was no error in ordering Dorsey to provide his fingerprints after his conviction but before the filing of his judgment and sentence.

For the first time on appeal, Dorsey also challenges the methodology the State's fingerprint expert relied on to conclude that Dorsey was the same individual who was convicted in the prior strike offenses. But Dorsey did not raise the issue of reliability

---

[67] See Smith v. United States, 324 F.2d 879, 882 (D.C. Cir. 1963) ("it is elementary that a person in lawful custody may be required to submit to . . . fingerprinting . . . as part of routine identification processes"); Napolitano v. United States, 340 F.2d 313, 314 (1st Cir. 1965) ("Taking of fingerprints [prior to bail] is universally standard procedure, and no violation of constitutional rights.").

[68] Surge, 160 Wn.2d at 74 ("In Washington, a person's privacy rights under article I, section 7 may vary based on that person's status as an arrestee, pretrial detainee, prisoner, or probationer.").

[69] See, e.g., State v. Fisher, 145 Wn.2d 209, 226, 35 P.3d 366 (2001) (after guilty verdict, even before entry of judgment and sentence, a defendant has "a diminished right of privacy because of the State's continuing interest in supervising convicted defendants"); State v. Massey, 81 Wn. App. 198, 200, 913 P.2d 424 (1996); State v. French, 88 Wn. App. 586, 593, 945 P.2d 752 (1997).

before the trial court, so the issue is not properly before this court. "When a party fails to raise a Frye argument below, a reviewing court need not consider it on appeal."[70]

Dorsey fails to demonstrate a basis for appellate relief as a result of the fingerprint procedures and evidence used at sentencing.

### Imposition of a Term of Community Custody

As part of Dorsey's sentence, the court imposed an 18-month term of community custody "if [the defendant is] ever released on this cause."[71] Dorsey asserts that the imposition of a term of community custody was error.

In sentencing a defendant for a violent offense such as Dorsey's conviction for robbery in the first degree, the sentencing court is normally required to impose a term of community custody.[72] However, for persistent offenders, RCW 9.94A.570 provides in pertinent part that:

> Notwithstanding the statutory maximum sentence or any other provision of this chapter, a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release or, when authorized by RCW 10.95.030 for the crime of aggravated murder in the first degree, sentenced to death. In addition, *no offender subject to this section may be eligible for community custody*, earned release time, furlough, home detention, partial confinement, work crew, work release, or any other form of release.[73]

---

[70] In re Det. of Taylor, 132 Wn. App. 827, 836, 134 P.3d 254 (2006).

[71] Clerk's Papers at 209.

[72] RCW 9.94A.701 provides, "If an offender is sentenced to the custody of the department for one of the following crimes . . . [a] court shall, in addition to the other terms of the sentence, sentence the offender to community custody for eighteen months . . . for a violent offense."

[73] RCW 9.94A.570 (emphasis added).

Because we uphold his life sentence, Dorsey makes no showing that under the existing statute he will ever serve any term of community custody. This issue is purely academic and is moot.[74]

Affirmed.

WE CONCUR:

_____

_____

_____

_____

---

[74] State v. Turner, 98 Wn.2d 731, 733, 658 P.2d 658 (1983).